[No. S004612. Crim. No. 23625. Sept. 19, 1988.]

THE PEOPLE, Plaintiff and Respondent, v.
MICHAEL WAYNE JENNINGS, Defendant and Appellant.

**COUNSEL**

Frank O. Bell, Jr., State Public Defender, under appointment by the Supreme Court, and Musawwir Spiegel, Deputy State Public Defender, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, Edward P. O'Brien, Assistant Attorney General, Herbert F. Wilkinson and Gerald A. Engler, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**EAGLESON, J.**—Defendant was convicted by a jury in the Contra Costa County Superior Court of first degree murder (Pen. Code, § 189)[1] (count I); forcible rape (§ 261, subd. (2)) (count II); first degree burglary (§§ 459-460) (count III); and robbery (§ 211) (count IV). He was found to have personally used a knife during the commission of each of these crimes (§ 12022, subd. (b)), all of which occurred on August 8, 1982, and involved the same victim, Violet Ann Newman. The jury found true special circumstance allegations that defendant intentionally committed the murder during the commission or attempted commission of the rape, residential burglary, and robbery. (§ 190.2, subd. (a)(17)(i), (iii) and (vii).) The jury fixed the penalty for the murder as death. After denying modification of the verdict (§ 190.4),

---

[1] All statutory references are to the Penal Code unless otherwise indicated.

the court imposed that penalty. This appeal is automatic. (§ 1239, subd. (b).)

Defendant seeks reversal of the verdicts of guilt on grounds that the trial court erred in admitting evidence of his pretrial statements which he claims were obtained by interrogating officers in violation of his right against self-incrimination after he had invoked his right to remain silent. (*Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974]; *People* v. *Fioritto* (1968) 68 Cal.2d 714 [68 Cal.Rptr. 817, 441 P.2d 625].) Defendant also challenges the penalty proceedings on a variety of grounds most of which are related to the propriety of the court's instructions to the jury.

After an independent review of the videotaped interrogation of defendant we conclude that the trial judge, who also reviewed the tape, could reasonably believe that defendant had not invoked his right to silence, and we find nothing in that tape to persuade us otherwise. Admission of defendant's statement was not error, therefore. Finding no error prejudicial to defendant during the penalty phase of the trial, we shall affirm the judgment in its entirety.

## I.

Violet Newman, the 63-year-old victim, died of multiple traumatic injuries she suffered in her Concord home at approximately midnight on Saturday, August 7, 1982. An autopsy revealed 14 stab wounds in her chest and abdomen, and a deep laceration across her neck that severed the left carotid artery and the jugular vein. A possible ligature mark encircled her neck. Marks on the ankles were consistent with those that a rope tied around the ankles would make. There were bruises and abrasions on the victim's face and neck. She had been raped in a manner that caused abrasions in the vaginal wall. Bruises on the inside of her right thigh could have been made by a knee. Semen found just above the pubic hairline was aspermatic, and contained A and H blood-type antigens.

Newman's body was found in her bedroom, on the bed, on Monday evening, August 9, by her brother-in-law who had been contacted by her employer when she failed to arrive at work on Sunday. She was unclothed except for a night hat and gloves. Her legs were spread wide apart. Her purse lay open at the foot of the bed. Her wallet and checkbook were missing, as was a telephone answering machine that she had kept in the living room.

Defendant was connected to the homicide only by circumstantial evidence. That evidence, however, was strong. His parents, with whom he had

lived until six weeks before the killing, were immediate neighbors of the victim. He had grown up with the victim's children. Defendant continued to visit frequently with his parents. A layered piece of strapping tape found in the victim's bed bore defendant's thumbprint and partial left palm print. Tape of the same size and type was found in the camper shell of defendant's pickup truck which was seized and impounded on August 12. Rope found in the truck was microscopically examined and determined to be made identically to a piece six inches long that had been found on the floor next to the victim's bed. This rope was the width of the ligature mark.

Microscopic examination of a piece of broken plastic found in defendant's truck established that it had come from an answering machine of the same make as that missing from the victim's house. Blood on the piece of plastic contained the AK type 2-1 enzyme as did the victim's blood. Defendant's blood type, A, contained AK type 1 enzyme. Moreover, his blood possessed A and H antigens like those in the aspermatic semen found on the body. Defendant was determined to be a secreter whose blood-type substances were present in his semen. He had undergone a successful vasectomy in 1976.

Boot prints on the victim's sheet were sufficiently similar to those made by the boots worn by defendant at the time of his August 12 arrest to have been made by those boots. A telephone call had been attempted from the victim's telephone at 2:19 a.m. on August 8 to the home of Ms. B., a friend of defendant with whom he had lived in 1981. She did not know the victim. Defendant had also attempted to reach her earlier during the night of August 7, when he telephoned from a bachelor party he was attending in Pittsburg. Although defendant had left the party to purchase beer and had returned without any money, he had $10 to $15 in currency and some change the next morning at 8 a.m. when he again returned to the house where the party had been held.

At 9 a.m. on August 8, defendant visited other friends who noticed that his hair was wet. He told them he had taken a whirlpool bath. The victim had a whirlpool machine. Although she habitually hung her towels on the bathroom towel racks, after the murder one was found thrown over the shower door. Defendant was in possession of a folding pocket knife at the August 7 party, but the next afternoon stated that he had lost the knife. The blade on the knife was about three and one-half to four inches in length, consistent with the stab wounds suffered by the victim.

Defendant told several persons that he had not left the August 7 bachelor party until Sunday morning. He had told an investigating officer that he had been at the party from 1:45 p.m. on Saturday until 4:30 a.m. on Sunday. He

later stated that he had left for two 15-minute periods before 11 p.m. Saturday to purchase drugs. Still later he told another officer that he had left the party at 11 p.m. to drive his brother home, after which he had returned to the party where he remained until 1 or 1:30 a.m. Sunday when he went to the home of another friend where he remained until 6:30 a.m. Sunday, at which time he returned to the house where the party had been given. The house in which the party had been held was seven to fifteen miles from the home of the victim dependent upon the route taken. Travel time between locations was 13 to 20 minutes.

No witness testified that petitioner had remained at the party all night. The testimony of those witnesses who had been at the party conflicted as to the time he had been absent, but all agreed that he had left the party several times.

After the victim's body was discovered, defendant made statements to acquaintances that referred to details that were not publicly known. On the night of August 10 he said that his neighbor had been tied up, stabbed numerous times, and it appeared an attempt had been made to cut her head off. He claimed he had been shown pictures of the body by the police, but the first photos had not been developed at the time he had been present during a police interview. On the same day, during an interview of defendant's parents by a police officer, defendant said that he could not see how anyone would rape such a nice old lady. He volunteered statements about the rape when interviewed at the police station on August 12. No information about the rape, the slashed throat, or that the victim had been tied had been released to the public.

The defense was alibi, coupled with an effort to suggest that another person who had been seen in or near a station wagon in the neighborhood on several occasions when a series of burglaries occurred, and who was in front of the victim's house on Monday, August 9, had committed the offenses.

## II.

### GUILT PHASE

Defendant's first claim, made in a brief filed before the decision of the United States Supreme Court in *Lockhart* v. *McCree* (1986) 476 U.S. 162 [90 L.Ed.2d 137, 106 S.Ct. 1758], is that trial by a "death-qualified" jury (*Witherspoon* v. *Illinois* (1968) 391 U.S. 510 [20 L.Ed.2d 776, 88 S.Ct. 1770]) denied him both the right to be tried by a jury representing a fair cross-section of the community and the right to trial by an impartial jury.

Both arguments were rejected by the Supreme Court in *Lockhart* as they had been earlier by this court in *People* v. *Fields* (1983) 35 Cal.3d 329 [197 Cal.Rptr. 803, 673 P.2d 680], and *Hovey* v. *Superior Court* (1980) 28 Cal.3d 1 [168 Cal.Rptr. 128, 616 P.2d 1301]. (See also *People* v. *Chavez* (1985) 39 Cal.3d 823, 827 [218 Cal.Rptr. 49, 705 P.2d 372]; *People* v. *Anderson* (1985) 38 Cal.3d 58, 60 [210 Cal.Rptr. 777, 694 P.2d 1149]; *People* v. *Zimmerman* (1984) 36 Cal.3d 154, 161 [202 Cal.Rptr. 826, 680 P.2d 776].) These arguments need not be addressed further. (*People* v. *Melton* (1988) 44 Cal.3d 713, 732 [244 Cal.Rptr. 867, 750 P.2d 741]; *People* v. *Miranda* (1987) 44 Cal.3d 57, 78-79 [241 Cal.Rptr. 594, 744 P.2d 1127].)

■■■ Defendant next argues that the trial court erred in denying in part his motion to exclude statements he made to investigating police officers on August 12, 1982, after he had, assertedly, invoked his right against self-incrimination. (*Miranda* v. *Arizona, supra,* 384 U.S. 436; *People* v. *Fioritto, supra,* 68 Cal.2d 714.)

Because the trial court apparently considered the motion as one directed to exclusion of defendant's statements on *Miranda* grounds, we review that court's determination that the statements were admissible on that basis. We note, however, that while the motion was one to suppress photos, videotapes, and recordings made by police investigators after defendant had invoked his *Miranda* rights, it was expressly described by defense counsel as "a 1538.5 motion";[2] was made as a pretrial *in limine* motion; and defendant made no objection when testimony regarding defendant's recorded statements was offered at trial. ■■■■■ Notwithstanding the use of these improper procedures by which to raise and preserve the issue,[3] we reach the

---

[2] Because the videotapes or recordings of defendant's statements are themselves evidence of the statements, as opposed to evidence obtained as a product of the statements, they were not tangible evidence subject to exclusion pursuant to a pretrial motion to suppress under section 1538.5. The reasoning by which defendant claimed that photographs taken of him were the product of his statements was not made clear in the motion. It appears that none of the evidence was properly subject to suppression under section 1538.5 since defendant did not claim it was the product of an unlawful arrest.

[3] Generally when an *in limine* ruling that evidence is admissible has been made, the party seeking exclusion must object at such time as the evidence is actually offered to preserve the issue for appeal. (See *People* v. *De Santiago* (1969) 71 Cal.2d 18, 22 [76 Cal.Rptr. 809, 453 P.2d 353]; *People* v. *Superior Court (Zolnay)* (1975) 15 Cal.3d 729, 734 [125 Cal.Rptr. 798, 542 P.2d 1390]; *Saidi-Tabatabai* v. *Superior Court* (1967) 253 Cal.App.2d 257, 266 [61 Cal.Rptr. 510]; *People* v. *Beasley* (1967) 250 Cal.App.2d 71, 77 [58 Cal.Rptr. 485]; 3 Witkin, Cal. Evidence (3d ed. 1986) § 2011, p. 1971.) The reason for this rule is that until the evidence is actually offered, and the court is aware of its relevance in context, its probative value, and its potential for prejudice, matters related to the state of the evidence at the time an objection is made, the court cannot intelligently rule on admissibility. When the parties stipulate on the record, as they did here, that a ruling on an *in limine* motion to exclude evidence will be binding, that stipulation should be deemed a continuing objection to admission. Failure to renew the objection when the evidence is offered does not waive the right to assert er-

merits of defendant's claim because the parties stipulated that the pretrial ruling would be binding at trial,[4] and the judge to whom the matter was submitted by finding the statements to be "voluntary" indicated that he had considered the motion to suppress as one directed to introduction of any evidence of the statement as having been obtained in violation of *Miranda*.

There was no actual hearing on the motion which was simply submitted on a brief written motion, opposition papers, and videotapes of the interrogation. No other evidence, and no argument, was offered on whether defendant was in custody. The court's only express finding in the minute order denying the motion in part was that defendant's statement was "voluntary."

██ The rule of *Miranda* is well established: "[W]hen an individual is taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning, the privilege against self-incrimination is jeopardized. Procedural safeguards must be employed to protect the privilege, and unless other fully effective means are adopted to notify the person of his right of silence and to assure that the exercise of the right will be scrupulously honored, the following measures are required. He must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires. Opportunity to exercise these rights must be afforded to him throughout the interrogation. After such warnings have been given, and such opportunity afforded him, the individual may knowingly and intelligently waive these rights and agree to answer questions or make a statement. But unless and until such warnings and waiver are demonstrated by the prosecution at trial, no evidence obtained as a result of interrogation can be used against him." (384 U.S. at pp. 478-479 [16 L.Ed.2d at p. 726].)

---

ror on appeal in these circumstances. Defendant's failure to object at trial to the admission of his statement does not preclude consideration of his assertion of error here.

[4] We accept the parties' characterization of their pretrial agreement as a "stipulation." Shortly before testimony of the interrogating police officer was to be offered at trial, counsel advised the judge that they had agreed or they "understood" that the earlier ruling, by a different judge, would be binding at trial. The record is ambiguous as to whether counsel reached this agreement on the basis of their mistaken understanding that because the ruling on the section 1538.5 motion necessarily involved a determination of whether there had been a *Miranda* waiver, that finding was "res judicata," or they simply agreed to be bound by the pretrial ruling.

At trial defense counsel asserted that he and the prosecutor believed that the pretrial ruling was a "res judicata decision or collateral estoppel decision." The trial judge said that he understood that "in effect the parties had ended up agreeing that the [pretrial] ruling would be the ruling of the Superior Court and would not seek relief from me . . . it made finding of voluntariness beyond a reasonable doubt and to a moral certainty in accordance with the law." The prosecutor then stated: "I agree with counsel's characterization of the agreement that the decision [pretrial] would be binding on the parties here."

■ In *People* v. *Fioritto, supra,* 68 Cal.2d 714, we recognized that once a defendant has indicated an intent to assert his right to remain silent or to counsel, all further attempts at police interrogation should cease. We also emphasized, however, that statements voluntarily initiated by a suspect are admissible, and that police officers have no obligation to dissuade an individual who comes to the police to confess or make a statement. (*Id.,* at p. 719.) ■ Although he does not make the nature of his argument explicit, defendant appears to be contending that he was in custody at the time his statements were made, and that his invocation of his rights during questioning was not honored by the police. The motion had asserted generally that once a defendant has invoked his Fifth Amendment privilege, statements obtained through further police interrogation are inadmissible, and statements are unlawfully seized if taken in violation of *Miranda,* or if involuntary. Defendant made no factual allegations in his motion or memorandum of points and authorities regarding the circumstances in which his statements were obtained. However, in relying on *Miranda,* the motion implicitly claimed that the threshold for invocation of the protections of that decision had been reached, i.e., that defendant was both in custody and undergoing custodial interrogation when the statements were made.

Defendant claims that he invoked his rights during an August 12 interrogation when he stated to Officer Cromwell: "I'll tell you something right now. You're scaring the living shit out of me. I'm not going to talk. You have got the shit scared out of me," and, "I'm not saying shit to you no more, man. You, nothing personal man, but I don't like you. You're scaring the living shit out of me. . . . That's it. I shut up."[5]

The ruling of the trial court that statements made by defendant after he made this pronouncement were "voluntary" implies that the court found either: (1) that defendant was not in custody at the time his statements were made; or,[6] (2) that he had not attempted to terminate the interview by

[5] The motion to suppress was granted as to statements defendant made on the next day, August 13, during the last five minutes of a taped interrogation after he had stated to Officer Maich: "This is getting us nowhere. I don't want to talk no more, Don." He was then addressing Officer Don Maich, whom he had known for 10 to 15 years. Maich had not been the primary interrogator, however. Officer Gordon Cromwell, whom defendant had not known prior to the interrogation, had conducted both sessions.

[6] Defendant argues that because the People did not dispute whether he was in custody at the time the suppression motion was submitted for decision, they may not do so now. Although defendant remained at the police station for approximately seven hours, during much of which he was questioned, several factors suggest that he was not in actual custody and the circumstances were not such that a person would reasonably believe he was under restraint equivalent to arrest. He had voluntarily accompanied an officer he knew to the police station. He was left alone in the interview room for lengthy periods of time. He stated on one occasion that he would leave. He suggested to the officers that they go out and confirm his alibi instead of questioning him further. He appeared to be relaxed and his attitude was that of a per-

invoking his rights; or, (3) that his subsequent statements were not induced by impermissible attempts at further interrogation after defendant had indicated his desire to terminate the interview.

Because we conclude that defendant did not invoke his right to silence by the remark to Officer Cromwell, we need not decide whether the custody question was raised by the motion or how it should be resolved.

Assuming that the trial court found or assumed that defendant was in custody when he made the statements in question, we agree with the trial court's implicit finding that defendant did not intend to invoke his right against self-incrimination. Were we to base our decision solely on the reporter's transcript of those portions of the interview on which appellant relies, his claim that he invoked his right to silence would appear meritorious. On a review of the full tape and consideration in context of the words on which defendant relies a different picture emerges. That part of the first interview at which defendant claims he asserted his rights involved a few moments when defendant lost his temper and expressed anger toward Officer Cromwell who was then questioning him about his whereabouts on the Monday following the murder. Officer Cromwell had indicated that there were discrepancies, and time unaccounted for. Defendant had apologized, stated that he did not remember that day well, and that the friends and relatives with whom he had spent parts of the day could account for his time. When the officer persisted in his attempt to clarify certain contradictory statements defendant had made, defendant became angry, said "this thing" [referring to the murder] and the investigation had him scared, and he was not going to say any more. Maich was present at the time.

Defendant had earlier indicated that he trusted Officer Maich, whom he had known for many years, and Officer Rose, for whom he had been a narcotics informant, not to misstate or twist what defendant said, and was talking to Cromwell only because Rose assured him Cromwell could be trusted to be fair. When defendant made the statements he claims were an invocation of his rights he was addressing Cromwell. Viewing the tape, observing defendant's demeanor before, during, and after the statements, and considering the context in which defendant made the statements on which he relies here, we conclude that the statements reflect only momentary frustration and animosity toward Cromwell. It is evident that defendant believed Cromwell was misconstruing defendant's statements and persisting in his attempt to get defendant to recall details about his whereabouts on Monday that he had already admitted he could not recall instead

---

son who both recognized the reason the police needed to talk to him and wanted to assist them in the investigation.

of doing as defendant had earlier suggested—going out and questioning those people who could account for his whereabouts on that day.

The court below, viewing this tape, could reasonably conclude that defendant was refusing to talk further with Cromwell whom he did not like or trust, as opposed to Maich or Rose, and that he was not invoking his right against self-incrimination when he made these statements. While we must review the record and make an independent determination of the question, we, like the United States Supreme Court, may "give great weight to the considered conclusions" of a lower court that has previously reviewed the same evidence. (See *Miller* v. *Fenton* (1985) 474 U.S. 104, 112 [88 L.Ed.2d 405, 412, 106 S.Ct. 445].) Having viewed the videotaped interrogation of defendant, and observed his interaction with the officers, we, too, conclude that his further statements were voluntary. Defendant did not, by those statements, indicate that he was invoking his right to silence. He apologized for his outburst and voluntarily continued the interview. The trial court did not err, therefore, in admitting the statements. (*People* v. *Davis* (1981) 29 Cal.3d 814, 824 [176 Cal.Rptr. 521, 633 P.2d 186].)

### III.

### Special Circumstances Claims

Defendant's only claim of error in the trial of the special circumstances allegations lies in the failure of the court to instruct the jury that a felony-murder special circumstance under section 190.2, subdivision (a)(17), requires not only a finding of intent to kill as this court concluded in *Carlos* v. *Superior Court* (1983) 35 Cal.3d 131 [197 Cal.Rptr. 79, 672 P.2d 862], but also a finding that this intent must be premeditated and a product of deliberation.

This claim is based on reasoning that *Carlos* was correctly decided, and that from *Carlos* it follows that if the culpability necessary to justify imposition of the death penalty requires that the murder be intentional, it must also meet the other requisites of first degree murder, i.e., premeditation and deliberation. (See § 189.) Inasmuch as we have reconsidered *Carlos* and concluded that it was not correctly decided, the predicate assumption for this argument fails. ■ A felony-murder special circumstance is established even absent intent to kill, premeditation, or deliberation, if there is proof beyond a reasonable doubt that the defendant personally killed the victim in the commission or attempted commission of, and in furtherance of, one of the felonies enumerated in subdivision (a)(17) of section 190.2. (*People* v. *Miranda, supra,* 44 Cal.3d 57, 89; *People* v. *Anderson* (1987) 43 Cal.3d 1104, 1138-1139 [240 Cal.Rptr. 585, 742 P.2d 1306].)

## IV.

Other than the evidence offered at the guilt phase, the only penalty phase aggravating evidence presented by the People was the testimony of the sister of defendant's former wife regarding his commission of acts of sexual misconduct in 1971, at a time when she was 13 years old. That evidence is discussed in greater detail below.

Defendant offered evidence, primarily through the testimony of law enforcement officers with whom or for whom he had "worked," regarding his assistance to those officers as a volunteer informant. Defendant had supplied information regarding narcotics transactions, burglaries, and other crimes, and had assisted in "controlled buys" of narcotics, and illegal or stolen firearms. Defendant's brother also testified regarding an incident in which he had been arrested by officers who came to the house and found in his pocket some marijuana that defendant had given him earlier in the day. That conviction and probation had "changed his life."

### PENALTY PHASE CONTENTIONS

#### A. *Aggravating Factors.*

The only aggravating factor, apart from those established by evidence introduced at the guilt phase of the trial, which the People sought to establish at the penalty phase of the trial, was that described in factor (b) of section 190.3: "The presence . . . of criminal activity by the defendant which involved the use or attempted use of force or violence or the express or implied threat to use force or violence." To prove past conduct of this nature by defendant, the People introduced evidence of incidents in 1971 when defendant engaged in acts of unlawful sexual conduct, oral copulation, and lewd conduct with his 13-year-old sister-in-law. He contends now that consideration of criminal conduct of which the defendant has not been convicted denies due process and permits imposition of cruel and unusual punishment. He also challenges admission of this evidence on the ground that the statute of limitations for prosecution of those crimes had run, and complains of error in instructing the jury on "rape."

#### 1. *Unitary jury.*

Defendant's first argument is based on an assertion that a jury that had convicted a defendant of first degree murder with special circumstances is incapable of reaching an objective, unbiased decision on the question of whether the other crimes have been proven beyond a reasonable doubt. The essence of the claim, therefore, is not that consideration of other-crimes evidence is constitutionally impermissible, but that a capital defendant is

entitled to have the penalty decision made by a second jury. We gave careful consideration to such a claim and to the due process implications of having a unitary jury in *People* v. *Balderas* (1985) 41 Cal.3d 144, 204-205 [222 Cal.Rptr. 184, 711 P.2d 480], where we concluded that the procedure is constitutionally permissible, and rejected the suggestion that the evidence was inadmissible per se. Nothing in the instant case persuades us that the issue should be reconsidered.

2. *Statute of limitations.*

■ We also reject defendant's argument that because the statute of limitations barred prosecution for defendant's other crimes, the conduct may not be considered an aggravating factor rejected under an earlier death penalty law in *People* v. *Terry* (1969) 70 Cal.2d 410, 422 [77 Cal.Rptr. 460, 454 P.2d 36]. There the claim was made with regard to evidence of a robbery for which prosecution was barred at the time the murder charge was filed. We rejected the claim, noting that section 800 which established a three-year period of limitation for initiating robbery prosecutions "does not prohibit the introduction of evidence of prior criminal acts for which prosecution would be barred by the statute of limitations. Such evidence is not introduced in order to impose a penalty for those prior acts, but rather as evidence 'of the circumstances surrounding the crime [of murder], of the defendant's background and history, and of any facts in aggravation or mitigation of the penalty [for murder]' as authorized by Penal Code section 190.1. The fact that the prosecution for the robbery may have been barred by the statute of limitations is immaterial here."

Determination of the appropriate penalty for murder with special circumstances under the 1978 death penalty law involves consideration of factors similar to those to which we referred in *Terry, supra,* 70 Cal.2d 410—the circumstances of the murder and of the defendant's background and history, the statutorily designated aggravating factors, and any mitigating evidence relevant to the determination offered by the defendant. (§ 190.3; *People* v. *Rodriguez* (1986) 42 Cal.3d 730, 786-787 [230 Cal.Rptr. 667, 726 P.2d 113]; *People* v. *Easley* (1983) 34 Cal.3d 858, 876 [196 Cal.Rptr. 309, 671 P.2d 813].)

Nothing in the language of the 1978 death penalty law indicates an intent to depart from the prior law by barring evidence of prior criminal conduct which took place outside the limitations period. The only statutory restriction on introduction of evidence of other criminal activity for consideration as an aggravating factor is that the conduct must have involved the express or implied threat to use force or violence; the evidence must not be admitted if the defendant has been acquitted of the offense; and except when intro-

duced for rebuttal the defendant must have advance notice of the evidence to be introduced. (§ 190.3.) As this court noted in *People* v. *Balderas, supra,* 41 Cal.3d 144, 205, footnote 32, the purpose of the "penalty phase is unique, intended to place before the sentencer all evidence properly bearing on its decision under the Constitution and statutes. Prior violent criminality is obviously relevant in this regard. . . ."

Evidence of a defendant's past criminal conduct may be essential to give the jury a true picture of the defendant's history since there is no temporal limitation on evidence in mitigation offered by the defendant. In addition, evidence of past, uncharged criminal conduct may reveal a pattern of continuous criminal activity or one of criminal activity of escalating seriousness by a defendant. Since this is highly relevant to the penalty decision, we are satisfied that section 190.3 does not contemplate limitation of such evidence to crimes for which prosecution is not barred by the applicable statute of limitations.

We have recently reached a similar conclusion in rejecting a claim that a time-barred felony may not form the predicate for a felony-murder special circumstance under sections 190.2, subdivision (a)(17), and 190.4. (*People* v. *Morris* (1988) 46 Cal.3d 1, 15 [249 Cal.Rptr. 119, 756 P.2d 843].) A fortiori there is no bar to consideration of earlier felonious conduct involving force or the threat of force as an aggravating factor.

3. *Instructions on prior forcible criminal activity.*

Defendant next contends that permitting the jury to consider his conduct with the child as an aggravating factor under section 190.3, factor (b), was error both because the evidence that the victim submitted to force or a threat of force was insufficient, and because the court erroneously instructed the jury under a statutory definition of rape enacted subsequent to his act, one which did not require a finding that the victim resisted or was prevented from resisting by threats of immediate harm. We conclude that the evidence was sufficient, and that defendant was not prejudiced by the court's error in identifying the conduct as rape and defining rape under an inapplicable statutory amendment of section 261.

a. *Evidence of force or violence.*

The witness testified that she did not call for help when defendant assaulted her while she was visiting in his home because she did not want to awaken her sister and because she was "scared." She also testified, however, that she was five feet two and weighed one hundred pounds, defendant was six feet tall and weighed one hundred seventy pounds, and that he lay down

on the couch next to her, placed her on her back, and then lay on top of her to accomplish the act.

The evidence was clearly sufficient to establish the use of force by defendant. The child did not submit. He turned her onto her back and lay on top of her. *People* v. *Peckham* (1965) 232 Cal.App.2d 163 [42 Cal.Rptr. 673], upheld a conviction for assault with intent to commit rape (§ 220) where the defendant, who was "very heavy," took the victim by the arm, put her on a table, and lay on her. Rejecting a contention that the evidence did not support the requirement of "force," the Court of Appeal explained: "[T]he 'force' requisite to sustain the conviction does not mean bodily harm but the physical power required in the circumstances to overcome [the victim's] resistance." (232 Cal.App.2d at p. 168.)[7] In addition, were there any question as to whether defendant accomplished the act by means of force, other uncontradicted evidence established submission under threat of force. In statements made to her mother and sisters after the rape, the victim said that defendant had threatened to kill or hurt her if she moved. These statements were admitted to rebut a claim of recent fabrication and thus could be considered by the jury for their truth. (Evid. Code, § 1236; *California* v. *Green* (1970) 399 U.S. 149 [26 L.Ed.2d 489, 90 S.Ct. 1930]; *People* v. *Cannady* (1972) 8 Cal.3d 379, 387-388 [105 Cal.Rptr. 129, 503 P.2d 585].) Although defendant contends Evidence Code section 1236, which permits the admission of prior consistent statements under certain circumstances, is inapplicable because the victim's statements to her mother and sister were inconsistent with her previous statements, he failed to make that specific objection and thus waived the issue for appeal. (See *Cannady, supra,* at p. 387.)

b. *Instructions.*

There is merit in defendant's claim that the court erred in instructing the jury on forcible rape as defined in section 261. This sexual assault

---

[7]Defendant's claim that the court erred in permitting the jury to consider the conduct underlying the allegation of lewd conduct because that conduct was not shown to involve the use of force fails for a similar reason. That incident occurred on the morning following the "rape" when the defendant committed other acts of sexual abuse on the same victim. The element of force was established by her testimony that defendant approached her from the back as she was working at the kitchen sink and "pushed himself against my buttocks, and I could feel his erection." This contact was unquestionably forcible. The victim did not consent and had no opportunity to avoid the contact which was made by pushing against her. The absence of force in defendant's subsequent acts of fondling and rubbing the victim is irrelevant since the initial contact was itself a violation of section 288 and was committed forcibly.

The third incident, a violation of section 288a, involved the same victim. It occurred on August 9, 1971, in defendant's vehicle. Defendant told the child to get into the back seat. She did not obey and told him he was scaring her. He then unzipped his trousers, and pushed her head down onto his erect penis. She testified that she was unable to do anything because defendant held his hand on the back of her head. Defendant does not argue that the evidence does not support a finding that he used force in the commission of this offense.

occurred on July 24, 1971. At that time, section 261 defined forcible rape as that occurring where the victim "resists, but her resistance is overcome by force or violence," or where the victim "is prevented from resisting by threats of great and immediate bodily harm, accompanied by apparent power or execution. . . ." The court instructed the jury under a subsequent amendment of the statute that rape could be established if it was "accomplished against the will of such person by means of fear of immediate and unlawful injury" to the victim, and that accomplishment of the act "by means of force or . . . by means of fear of immediate and unlawful bodily injury to such person. . . ." Resistance by the victim is not an element of the offense under the amended statute.

Had defendant been charged, convicted, and punished under the amended statute without instructions to the jury that resistance or prevention of resistance was an element of the offense of rape, the prohibition against ex post facto laws found in article I, section 9 of the California Constitution, and article I, section 9, and the Fourteenth Amendment of the United States Constitution would be violated. ■ Each prohibits retroactive application to a criminal defendant of a statute or statutory amendment which enlarges the elements of an offense—making criminal conduct that was encompassed within the statutory definition of the offense at the time of the defendant's conduct, lessens the People's burden of proof, or increases the penalty over that in effect at the time of the crime. (See *Conservatorship of Hofferber* (1980) 28 Cal.3d 161, 180 [167 Cal.Rptr. 854, 616 P.2d 836]; *People* v. *Benefield* (1977) 67 Cal.App.3d 51 [136 Cal.Rptr. 465]; *DeWoody* v. *Superior Court* (1970) 8 Cal.App.3d 52, 56 [87 Cal.Rptr. 210].) No constitutionally impermissible application of the law occurred here, however.

■ Defendant's focus on the court's instruction and reference to the conduct as "rape," overlooks the distinction between the clearly impermissible ex post facto application of a penal statute under which a defendant is convicted or punished, and the nature of the aggravating factor established by section 190.3. That factor does not limit consideration of prior criminal conduct to offenses in which force or assaultive conduct is an element of the offense. Proof that defendant committed forcible rape was not required. Factor (b) of section 190.3 permits consideration of *any* "criminal activity by the defendant which involved the use or attempted use of force or violence or the express or implied threat to use force or violence." In 1971, when the sexual assault occurred, section 261.5 defined "unlawful sexual intercourse" as "an act of sexual intercourse accomplished with a female not the wife of the perpetrator, where the female is under the age of 18 years." Prior to a 1970 amendment of section 261, this offense had been included in that section's definition of "rape." Although renamed in the amendment, the conduct was no less criminal when defendant assaulted his

sister-in-law. The question then, under section 190.3, is not what the elements of rape were in 1971, but whether the instructions required that the jury find that defendant engaged in criminal activity accomplished by means of force or the threat of force. (See *People* v. *Balderas, supra,* 41 Cal.3d 144, 200-201; *People* v. *Boyd* (1985) 38 Cal.3d 762, 776-777 [215 Cal.Rptr. 1, 700 P.2d 782].)

Although the instructions given improperly identified the relevant conduct as "rape," they did require that the jury find all of the elements of the crime of unlawful sexual intercourse, and to find that it was accomplished by means of force or threats of force.[8] Section 190.3 requires no more.

Defendant also argues that the jury may have been misled by the court's instruction that if they found defendant had committed the sexual offenses, the conduct could be considered aggravating. He suggests that this instruction permitted nonforceable conduct to be considered. We disagree. The jury was instructed that to be considered aggravating the other criminal conduct had to involve the use or attempted use of force or a threat to use force. That instruction encompassed each of the crimes which the court defined. ▮▮▮▮ Not only do we find no tendency to mislead in the instructions, to which counsel had agreed, but in light of the uncontradicted evidence that each of the three offenses had been committed forcibly, we are satisfied that any possible tendency to mislead could not have been prejudicial[9]

___

[8] The instructions advised the jury: "Evidence has been introduced in the guilt and penalty phases of this trial that may show that the defendant engaged in criminal activity which you may not consider as a factor in aggravation. *You may consider only the crimes which I will define for you in determining whether or not the defendant has engaged in criminal activity which involves the use of or the express or implied threat to use force or violence.*" (Italics added.) Rape, lewd conduct with a child under 14, and oral copulation were defined.

The judge then expressly advised the jury that it might not consider evidence that had been received regarding defendant's involvement with illegal drugs. Defendant reasons that this instruction directed the jury that it had to consider the rape, lewd conduct and oral copulation aggravating if it found that defendant had committed the crimes, even if there was no force or threat of force.

[9] The People argue that any error in this regard should be considered invited error (see *People* v. *Wickersham* (1982) 32 Cal.3d 307, 330 [185 Cal.Rptr. 436, 650 P.2d 311]), or found to have been waived because defense counsel and the prosecutor agreed between themselves on the instructions to be given. Defendant's counsel said to the court at the time the agreement was announced: "Your Honor, I do not have any objections to the death penalty instructions as they are now worded. As a matter of fact, I will say for the record that I am confident that the present wording of the instructions is a far better state of affairs for the defendant's presentation of argument in this case than the CALJIC instructions from which they were worked up and, therefore, I am presently of the opinion that they are the most favorable set of instructions to the defense that can conceivably be justified by the present state of California law." It appears, however, that counsel had first expressed his continued objection to consideration of the evidence of the sexual offenses as an aggravating factor.

With regard to the other-crimes instructions specifically, counsel stated: "[T]he present 'other crimes instructions' as now set forth are substantially those as proposed by the defendant and are completely acceptable at this time to the defendant. . . ."

4. *Notice of aggravating-factors evidence.*

 Finally, with respect to the evidence of aggravating factors, defendant contends that the court erred in permitting the mother of the child whom he had abused to testify because she was not named among the witnesses identified in the prosecutor's pretrial notice. That notice must be given pursuant to section 190.3, which provides in pertinent part: "Except for evidence in proof of the offense or special circumstances which subject a defendant to the death penalty, no evidence may be presented by the prosecution in aggravation unless notice of the evidence to be introduced has been given to the defendant within a reasonable period of time as determined by the court prior to trial. Evidence may be introduced without such notice in rebuttal to evidence introduced by the defendant in mitigation."

In the notice of evidence in aggravation the prosecutor included the accusation of sexual offenses on the child victim, adding in a supplemental notice filed four days later a police report of an interview with the child detailing the assaults. That report mentioned the child's mother, stating that the victim had reported the incidents to her mother two years after they occurred. Neither the notice, nor the police report, advised that the mother would be called to testify that she had confronted defendant with the child's accusation, which he had not denied. The mother's testimony was admitted at the penalty trial as evidence of an adoptive admission of the conduct by defendant. Defendant was notified that the mother would be called on the morning she testified. The prosecutor advised the court and defense counsel that he had first spoken with the witness that morning and only then learned that she had confronted defendant with the child's accusations. Defendant's objection to admission of the testimony was overruled. Defendant contends that this was prejudicial error since the adoptive admission was the only penalty phase evidence of aggravating factors apart from the victim's own testimony regarding the sexual offenses and the evidence of her hearsay statements about them.

Defendant, however, did not object to admission of the evidence on the ground he now asserts in support of his claim of error. Rather, he explained to the court before the penalty trial began that he would object to admission of the mother's testimony on grounds that the hearsay statements would deny his right of confrontation and cross-examination, a claim he does not

However, we find defendant waived his further claim that he was entitled to have his jury instructed that before considering the evidence of the 1971 sex crimes, it must find the victim submitted as a result of the implied threat of force or violence. Even assuming arguendo that such subjective knowledge is legally required, the normal rule is that "a defendant's failure to request instruction on the elements of the other-crimes aggravating evidence will preclude him from raising the issue on appeal." (*People* v. *Davenport* (1985) 41 Cal.3d 247, 282 [221 Cal.Rptr. 794, 710 P.2d 861].) Defendant is unpersuasive in arguing that he should be excepted from this general rule.

renew on appeal. He did state in addition that he had not been furnished with anything that described what the proffered testimony would be and had not been able to anticipate that such testimony would be offered, an objection that appears to refer to failure to make pretrial disclosure of evidence, not failure to comply with the notice requirement of section 190.3. Finally, defense counsel stated: "It's essentially an evidence brought on a hearsay objection. [*Sic.*]" When the testimony was actually offered, the objection was based solely on denial of defendant's confrontation rights.

Even under a broad reading of the objection as explained to the court before the penalty trial commenced, however, we find no error in admitting the evidence. ■■■ Section 190.3 has been construed as requiring pretrial notice of the actual evidence on which the prosecution intends to rely to establish aggravating factors at the penalty phase. (*Keenan* v. *Superior Court* (1981) 126 Cal.App.3d 576, 586-587 [177 Cal.Rptr. 841]. See also *People* v. *Phillips* (1985) 41 Cal.3d 29, 72, fn. 25 [222 Cal.Rptr. 127, 711 P.2d 423].) The apparent intent underlying that notice provision, however, is to afford capital defendants notice of the evidence actually to be used at the penalty phase without the necessity of resort to the discovery procedures utilized to obtain information about the evidence on which the prosecution may rely to establish guilt, i.e., an accused is entitled to any pretrial knowledge of any unprivileged evidence. Therefore, the prosecutor must reveal all evidence of which it is then aware. (Accord, *People* v. *Keenan* (1988) 46 Cal.3d 478, 524 [250 Cal.Rptr. 550, 758 P.2d 1081].)

■■■ Nothing in the language of section 190.3, however, suggests that it was intended to grant the defendant any greater rights with respect to penalty phase evidence, or that evidence of which the prosecution had no knowledge when the original notice is given must be excluded. Such a construction would be inconsistent with the purpose of section 190.3 that the jury be made aware of all of the factors bearing on the penalty decision. As with guilt phase evidence of which the prosecution becomes aware after compliance with the initial discovery request, the defendant is entitled to prompt notice of the newly discovered evidence, and, if necessary, to a reasonable continuance to enable him to prepare to meet that evidence. If the prosecution delay is unreasonable or unexcused or if the delay will prejudice the defense, the court must exclude the evidence. (See *People* v. *Howard* (1988) 44 Cal.3d 375, 419-425 [243 Cal.Rptr. 842, 749 P.2d 279].)

■■■ Here the prosecutor notified counsel as soon as he learned of the evidence, and offered to stipulate to a short continuance to enable defense counsel to interview the witness. Thus, the failure to give notice earlier did not bar introduction of the evidence. Since defendant had notice and was afforded the opportunity to prepare to meet the evidence, he was not denied any rights under the notice provision of section 190.3. (See *People* v. *How-*

*ard, supra,* 44 Cal.3d at p. 425; *People* v. *Miranda, supra,* 44 Cal.3d at pp. 96-97.)

B. *Other Penalty Trial Claims.*

1. *Jury unanimity.*

Defendant claims that the court erred in instructing the jury that unanimous agreement that defendant committed the criminal conduct asserted as aggravating factors was not required, and that an individual juror who was satisfied beyond a reasonable doubt that defendant committed the offense could consider it in making the penalty determination. We held, however, in *People* v. *Rodriguez, supra,* 42 Cal.3d 730, 777-778, that unanimity was not required either by the statute or as a constitutional procedural safeguard. (See also *People* v. *Miranda, supra,* 44 Cal.3d 57, 99; *People* v. *Ghent, supra,* 43 Cal.3d 739, 773-774; *People* v. *Allen* (1986) 42 Cal.3d 1222, 1285 [232 Cal.Rptr. 849, 729 P.2d 115].)

2. *Failure to delete reference to irrelevant mitigating factors.*

Defendant's claim that the court should have deleted reference to irrelevant mitigating factors from the instructions given to the jury regarding the aggravating and mitigating factors to be considered in determining the appropriate penalty is one rejected by this court in several recent cases. As we explained in *People* v. *Melton, supra,* 44 Cal.3d 713, 770-771, giving instructions as to all of the statutory aggravating and mitigating factors ensures that the jury is aware of the complete range of factors that the state considers relevant to the penalty determination. With that knowledge the jury is better able to place the individual defendant's conduct in perspective, and thus its exercise of discretion to select the appropriate penalty is further channeled and directed as required by the Eighth Amendment. (See *Gregg* v. *Georgia* (1976) 428 U.S. 153, 192 [49 L.Ed.2d 859, 885, 96 S.Ct. 2909].)

Reference to all statutory mitigating factors, moreover, ensures that the defendant is not prejudiced by the omission of any that the jurors might conclude do apply. (*People* v. *Ruiz* (1988) 44 Cal.3d 589, 619 [244 Cal.Rptr. 200, 749 P.2d 854].) A jury advised by the court to consider any statutory factor that is applicable is capable of making that determination. (*People* v. *Ghent, supra,* 43 Cal.3d 739, 776-777.)

3. *Permitting consideration of defendant's age.*

Defendant next contends that the court erred in instructing the jury, in the language of factor (i) of section 190.3, that among the factors to

be considered in determining the penalty, if relevant, is "[t]he age of the defendant at the time of the crime." He contends age may be considered only as a mitigating factor, but the failure of the court to so advise the jury permitted his age to be considered as an aggravating factor.

In *People* v. *Rodriguez, supra,* 42 Cal.3d 730, 789, we held that "mere chronological age, a factor over which one can exercise no control, should not *of itself* be deemed an *aggravating* factor." (Italics added.) We have not condemned all reference to age, however. Mere chronological age by itself is something over which a defendant has no control, and therefore is not relevant to the penalty decision as either a mitigating or an aggravating factor. The age "factor," however, permits the jury to consider "any age-related matter suggested by the evidence or by common experience or morality that might reasonably inform the choice of penalty. Accordingly, either counsel may argue any such age-related inference in every case." (*People* v. *Lucky* (1986) 45 Cal.3d 259, 302 [247 Cal.Rptr. 1, 753 P.2d 1052].)

In this case, although the court gave no supplementary instruction regarding the age factor, the prosecutor's argument appropriately placed that factor in the perspective approved by this court in *Lucky* and *Rodriguez.* His argument was structured in such a way that the jury was first reminded that the court had already advised them of the various factors to be considered in the penalty determination. He did not expressly refer to each factor in discussing what the evidence reflected as to the circumstances of the offense and of defendant. He made no reference to the "age" factor as such, but stated: "Mr. Jennings is no neophyte. He was 32 years old at the time these crimes against Violet Newman were committed. He was no 18-year-old, or 19-year-old. Wise to the ways of the world; had lived outside the family home; had married; had children; had substantial contact with the police in his work as an informant. No neophyte at all."

The jury was given appropriate guidance regarding the relevance of the age factor by this argument.

4. *Consideration of excessive special circumstances.*

The instructions given at the penalty phase, again mirroring the statutory language (§ 190.3, factor (a)), advised the jury that in determining the penalty it should take into account: "The circumstances of the crime of which the defendant was convicted in the present proceeding and the existence of any special circumstances found to be true. . . ." Defendant claims that this instruction erroneously permitted the jury to consider both the robbery special circumstance and the burglary special circumstance

even though both arose out of the same set of facts arising from a single criminal objective.

This claim, based on the plurality opinion in *People* v. *Harris* (1984) 36 Cal.3d 36, 60-67 [201 Cal.Rptr. 782, 679 P.2d 433], was rejected by the court in *People* v. *Melton, supra,* 44 Cal.3d 713, 765-767. In this case there was no suggestion by the prosecutor that the special circumstances which the jury had found true or that any other aggravating factors should be considered mechanically, that is that the number of factors or special circumstances should be determinative in the penalty decision.[10] To the contrary rather than exploiting the sheer number of special circumstances, again without special mention of them, the prosecutor asked the jury to consider the actual circumstances of the crime and the societal values which defendant's conduct invaded.[11]

---

[10] With some prescience (see *People* v. *Allen, supra,* 42 Cal.3d 1222, 1276-1277; *People* v. *Brown* (1985) 40 Cal.3d 512, 541 [220 Cal.Rptr. 637, 709 P.2d 440], revd. *California* v. *Brown* (1987) 479 U.S. 538 [93 L.Ed.2d 934, 107 S.Ct. 837]), the prosecutor explained to the jury: "It is not a question of simply counting up the numbers of factors on one side and placing them against the number of factors on the other side. What it involves is a weighing process that requires you to bring to the thought process and deliberation process a subjective process of placing weight, value upon the items that you have been directed to consider, and in a very real sense what is brought to that process is the very value system that you have individually and as representatives of the community from which you come.

"How you give weight to each of these factors that you have been directed to consider and take into account will in large measure be an expression of the values held by you individually as representatives of this community in looking at the facts of this case. . . ."

Defendant's counsel reemphasized this point during his argument: "I think it's appropriate that I tell you again that this is not a process of arithmetic that you are to enter upon. This is not a matter of deciding if there are six aggravating factors and five mitigating factors. . . . Your function is to weigh how important any one of those factors might be and to then, based upon the weight of those factors that are on either side of your scale, find out what this tells you that you must do for a verdict in this case."

[11] During the argument, in which he asked the jury to focus on "who, where, why, and how," the prosecutor referred to the location in which the offenses occurred, stating: "[T]here is something important that stems from our system of values about where this crime occurred. You've heard from the time you were small probably the phrase, 'A man's house is his castle.' That's an expression of value. . . . Crimes of which Mr. Jennings has been convicted violate that value to the very core, committed in the home of Mrs. Newman and in her own bed, aggravating in the extreme."

The prosecutor referred to the robbery only in his general discussion of "why" the crimes had been committed, suggesting "pleasure, personal gain, and a desire to exploit somebody else. You see, it does make a difference why a crime is committed. It does make a difference, and if Mr. Jennings had stolen from Mrs. Newman because he had no food or because he had a family that had nothing and he was the sole source of their support, one could understand with some compassion that kind of motivation, but what was his motivation? Pleasure stealing of money, personal gain, pleasurement. . . . The 'why' strikes at values that are important to each of you."

### 5. *Instruction to disregard consequences of verdict.*

In *People* v. *Brown, supra,* 40 Cal.3d 512, 537, footnote 7, we held that CALJIC No. 1.00, instructing the jury that it should reach a just verdict "regardless of what the consequences of such verdict may be," should not be given at the penalty phase of a capital trial. In this case, tried before our *Brown* decision, that instruction was among the introductory penalty phase instructions given by the court prior to the arguments of counsel.

Our disapproval of the instruction lay in its potential to diminish the jury's sense of responsibility for the penalty decision it was to reach since the precise issue before the jury—whether the penalty shall be death or life imprisonment without possibility of parole—is the "consequence" of the verdict. Instructions which lead a jury to believe that responsibility lies elsewhere for determining that death is the appropriate penalty are constitutionally impermissible. (*Caldwell* v. *Mississippi* (1985) 472 U.S. 320, 328-329 [86 L.Ed.2d 231, 239, 105 S.Ct. 2633]; *People* v. *Milner* (1988) 45 Cal.3d 227, 253 254 [246 Cal.Rptr. 713, 753 P.2d 669].)

It is clear, however, in this case that the jury was not misled and did understand that the consequences of the verdict were the personal responsibility of the jurors. The prosecutor acknowledged the serious nature of the task. Defense counsel referred to the function of the jurors as "frightening," and as the exercise of godlike power to take human life. We are satisfied, therefore, that the instruction, although erroneously given, was not prejudicial.

### 6. *Brown (CALJIC No. 8.84.2) error.*

The instructions to the jury regarding its consideration of the evidence of aggravating and mitigating factors told the jurors simply that "if you conclude that the aggravating circumstances outweigh the mitigating circumstances, you shall impose a sentence of death." The instructions did not elaborate on the duty of the jury to ensure that the jurors were aware both that the weighing process was not a mechanical one and that the weight to be assigned to any factor was left to their judgment, and of the full scope of their discretion to determine the appropriate penalty and to opt for life imprisonment without possibility of parole on the basis of any mitigating evidence or sympathy factor. In *People* v. *Brown, supra,* 40 Cal.3d 512, 544, footnote 7, and *People* v. *Easley, supra,* 34 Cal.3d 858, 881-884, we held that in future cases clarifying instructions should be given to avoid any misunderstanding on the part of the jury as to its obligations and discretion. In cases tried before *Brown,* we examine the record, including the argument

of counsel, to determine whether there is any reasonable likelihood that the jurors misunderstood their role.

In this case our task is not difficult. In addition to instructing the jury on the statutory factors in aggravation and mitigation set forth in section 190.3, the judge instructed that the jury was to consider: "any other aspect of the defendant's character or record that supports a verdict of confinement in state prison for life without the possibility of parole" and "sympathy and/or pity for the defendant." These instructions, coupled with the prosecutor's argument, were adequate to ensure that the jury fully understood the scope of its discretion and how that discretion was to be applied.

Not only did the prosecutor fully advise the jury with respect to the manner in which it should weigh the evidence of aggravating and mitigating factors, but he also expressly advised the jury that it could reject death as a penalty on the basis of sympathy regardless of whether that sympathy for the defendant was supported by evidence introduced at the trial.[12] The scope of its sentencing discretion could not have been made more clear to the jury.

7. *Burden of proof that death is appropriate.*

Defendant argues that a capital jury must be instructed that it must be satisfied beyond a reasonable doubt that death is the appropriate penalty if the punishment is to be imposed. That claim, too, has been rejected in several recent decisions of this court. (See *People* v. *Melton, supra,* 44 Cal.3d 713, 762-763; *People* v. *Miranda, supra,* 44 Cal.3d 57, 107.)

---

[12] Concluding his argument the prosecutor said: "Let me end by talking to you about one of the final factors that's in the laundry list in your instructions. It's the factor called 'sympathy and pity.'

"You've been repeatedly told throughout this whole trial that in making the fact decision that you have to make, that you are not to make those decisions based upon sympathy or pity for the defendant or for anger against him and so forth. You've been repeatedly told that in the process of making factual decisions you're not to use sympathy or pity.

"*The law does allow, however that in deciding whether or not the defendant shall receive a verdict of death or a verdict of life in prison without the possibility of parole, you are entitled, if you wish, to do so because of pity and sympathy for the defendant.* There is a place in courtrooms, there is a place in the criminal justice system for mercy, sympathy, and compassion. It is not a stranger to courtrooms, but there are also times when pity and mercy and sympathy are inappropriate. Times when it is right to hold somebody strictly accountable for the consequences of his or her conduct, and *if you make a decision in this case, as you're legally entitled to do based upon factually unjustified sympathy,* just sympathy based on a whim or just on sheer emotions, the whole rule of law is undermined." (Italics added.)

## V.

### MODIFICATION APPLICATION

 Finally defendant contends that remand for reconsideration of the application for modification of penalty deemed to be made pursuant to subdivision (e) of section 190.4 is required because the trial court misunderstood the factors to be considered and failed to properly consider mitigating evidence.

Defendant's claim is based on the trial judge's remark that he considered defendant's age to be an aggravating factor, and what he believes was a literal understanding of "factor (k)," which permits consideration of any circumstance which "extenuates the gravity of the crime even though it is not a legal excuse for the crime." (§ 190.3, factor (k).) Read in context, however, the court's statement regarding defendant's age suggests that the court meant nothing more than rejection of age as a mitigating factor. Nor does the court's statement suggest that the judge did not fully understand his responsibility to consider all evidence offered in mitigation, not simply that related to the circumstances of the crime.

Section 190.4, subdivision (e), directs: "In ruling on the application, the judge shall review the evidence, consider, take into account, and be guided by the aggravating and mitigating circumstances referred to in Section 190.3, and shall make a determination as to whether the jury's findings and verdicts that the aggravating circumstances outweigh the mitigating circumstances are contrary to law or the evidence presented. The judge shall state on the record the reasons for his findings." In his statement reciting the statutory factors in aggravation and mitigation, and his findings as to each, the trial judge said: "The tenth factor to be considered is the age of the defendant at the time of the crimes. The defendant was born in 1950 and was, at the time of the commission of these offenses, 32 years old. The Court finds this factor to be an aggravating factor since by the age of 33 this defendant, from all of the evidence presented, had reached his full level of maturity. His conduct then, neither cannot nor should not be mitigated because he was neither old enough to fully understand the character and nature of his conduct nor because he was so old as to be considered infirm thereby allowing age to become a factor in mitigation." Nothing elsewhere in the court's statement suggests that the judge believed the absence of a mitigating factor to be aggravating. The statement may reflect nothing more than a belief that defendant's age could not be considered a mitigating factor, but even if the court weighed it as an aggravating factor, the misunderstanding was not prejudicial.

That the court understood that conduct unrelated to the circumstances of the offense could and must be considered when offered in mitigation is made

clear by the express statement of the judge: "The final factor is (k) 'Any other circumstance which extenuates the gravity of the crimes even though it is not a legal excuse for the crimes.'

*"The court has considered all the evidence including that of the defendant's activities as a police informant,* and concludes that there are no circumstances which extenuate the gravity of the crimes the defendant has committed." (Italics added.)

## VI.

### VICTIM IMPACT STATEMENT

 The victim's son was permitted to address the court prior to the ruling on the section 190.4 motion for modification. He offered the views of the family, recited personal knowledge of defendant whom he characterized as a "bully" and "braggart" who "loved to fight," and described the impact of the crime on the family members.

In *Booth v. Maryland* (1987) 482 U.S. 496 [96 L.Ed.2d 440, 107 S.Ct. 2529], the United States Supreme Court held that a similar "victim impact statement" could not constitutionally be presented to the sentencing authority—there the jury—in a capital case. The court reasoned that it was not relevant to any issue the jury was called on to decide in selecting the appropriate penalty, and would divert the jury from the focus on the defendant "as a uniquely individual human being" which is required in capital sentencing. In broad concluding language, the court stated that "the introduction of a VIS at the sentencing phase of a capital murder trial violates the Eighth Amendment. . . ." (96 L.Ed.2d at p. 452.)

Therefore, although consideration of the victim impact statement by the sentencer is authorized when sentence is imposed under the Determinate Sentencing Act (§ 1170 et seq.),[13] a capital jury may not consider that kind of "victim impact," and the court should not consider such evidence of victim impact prior to ruling on the section 190.4 motion. (See *People v. Williams* (1988) 45 Cal.3d 1268, 1328 [248 Cal.Rptr. 834, 756 P.2d 221]; *People v. Babbitt* (1988) 45 Cal.3d 660, 724-725 [248 Cal.Rptr. 69, 755 P.2d 253].) While the Eighth Amendment considerations noted by the United States Supreme Court are not implicated at that proceeding, evidence of victim impact is irrelevant to the determination the court is required to

[13] The victim's son was permitted to make the statement pursuant to section 1191.1, enacted as part of Proposition 8 on June 8, 1982. The statute provides, inter alia: "The victim . . . or next of kin has the right to appear, personally or by counsel, at the sentencing proceeding and to reasonably express his or her views concerning the crime, the person responsible, and the need for restitution. The court in imposing sentencing shall consider the statements . . . made pursuant to this section . . . ."

make. The function of the trial judge in ruling on the application for modification is to "make an independent determination whether the death penalty is proper in light of the relevant evidence and the applicable law . . ." and to determine if the weight of the evidence supports the jury verdict after assessing the credibility of the witnesses, determining the probative force of the testimony, and weighing the evidence. Thus, the evidence that the court is to review is only that which was before the jury.

The record in this case satisfied us that the trial court did no more. Consideration of the statement by the victim's son did not enter into the ruling denying modification.

## VII.

### PROPORTIONALITY REVIEW

Defendant asks that the court undertake proportionality review of the judgment imposing the sentence of death on him. ▓▓▓ Although such review is not constitutionally mandated (*Pulley* v. *Harris* (1984) 465 U.S. 37, 51-54 [79 L.Ed.2d 29, 41-43, 104 S.Ct. 871]), the Eighth Amendment and article I, section 17 of the California Constitution preclude the imposition of punishment that is not proportionate to individual culpability. (*Solem* v. *Helm* (1983) 463 U.S. 277, 290 [77 L.Ed.2d 637, 649, 103 S.Ct. 3001]; *People* v. *Bean, ante,* p. 919.) We are therefore obligated to set aside the penalty in any case in which it is aberrant or appears to have been imposed in an arbitrary or capricious manner. Our review of the record in this case supports the conclusion of the trial judge that the record fully supports the finding of the jury that death is the appropriate penalty in light of the circumstances of the crime and of defendant.

## VIII.

There being no error prejudicial to the defendant at the guilt or penalty phase of the trial, the judgment is affirmed in all respects.

Lucas, C. J., Mosk, J., Broussard, J., Panelli, J., Arguelles, J., and Kaufman, J., concurred.

Appellant's petition for a rehearing was denied November 10, 1988, and the opinion was modified to read as printed above.