Filed 5/19/14  P. v. Loren CA1/5

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>JOHN E. LOREN,<br><br>        Defendant and Appellant. | A137982<br><br>(San Francisco City and County<br>Super. Ct. No. 217899) |

John E. Loren was charged with felony sexual assault, but convicted by jury of misdemeanor battery.  On appeal, Loren challenges only the admission at trial, over his objection, of a recorded statement he gave to investigating officers.  Loren contends that the *Miranda*[1] warnings given to him in both English and in his native Tagalog were inadequate and ambiguous, officers questioned him after he invoked his right to counsel, and his waiver of rights was not knowing, voluntary and intelligent.  Consequently, he argues, the trial court erred in denying his motion to suppress his statements to law enforcement.  We disagree and affirm.

## I.     BACKGROUND

Facts relating to the charges against Loren are of only limited relevance to the single issue presented on appeal.  We briefly recite them for context.

Loren worked at a fastfood restaurant on Market Street in San Francisco.  On February 23, 2012, at about 4:00 a.m., victim S.M. entered the restaurant and made a

---

[1] *Miranda v. Arizona* (1966) 384 U.S. 436.

1

small purchase. S.M. testified that Loren left the restaurant with her to look for an automated teller machine, after Loren was unable to process her debit card for the transaction. At the intersection of Market and Hayes streets, Loren grabbed S.M.'s hand, pulled her towards him, and "bear hug[ged]" her torso, with her arms pinned underneath his. Loren kissed S.M.'s cheek as she tried to push him away. She told him to stop and started screaming. S.M. said that Loren grabbed her hands and either pushed or tackled her to the ground. Loren put his hand over her mouth to try to stop her from screaming. S.M. said that Loren groped and squeezed her breast underneath her bra. He also put one of his hands between her legs, rubbing her vagina, and attempted to digitally penetrate her. At one point he grabbed and squeezed her buttocks. When a passing car stopped, Loren ran away in the direction of the restaurant.

Police were called. S.M. complained of pain to her right breast, and an investigating officer took photographs of red marks and scratches in the areas of her chest and breast. She had scratches on both hands and bruises on both thighs. S.M. declined medical treatment.

San Francisco Police Inspector Joseph Nannery interviewed Loren.[2] Loren's primary language is Tagalog. Nannery was assisted in the interview by Officer Alaric Wu, who spoke Tagalog. During the interview Loren said, "All I remember is that I touched her, and that's it." He said that S.M. slipped as he attempted to hug her, and that she had initiated the hug. When she fell on the ground, he touched her chest and she screamed. When asked "how many seconds did your hand go inside her shirt?" he said, "Only briefly." When asked, "What did you squeeze?" he said, "the breast." He said he touched "it," but "[j]ust for a second." Loren denied kissing S.M., covering her mouth, or pulling or pushing her. He was asked if he touched S.M.'s vagina. Loren said "I just touched it, like that." He said "[w]hen I touched her vagina, that's when I ran."

Loren was charged by information with assault with intent to commit sexual penetration by foreign object (Pen. Code, § 220, subd. (a)(1)), sexual battery by restraint

---

[2] We discuss the circumstances of the interview in greater detail *post*.

(*id.*, § 243.4, subd. (a)), and attempted forcible sexual penetration by foreign object (*id.*, §§ 664, 289, subd. (a)(1)(A)). An initial jury trial resulted in a mistrial when the jury was unable to reach a verdict.

A second jury trial commenced on January 24, 2013. On February 8, 2013, the jury returned its verdict finding Loren not guilty of the three charged offenses, but finding him guilty of simple misdemeanor battery (Pen. Code, § 242) as a lesser offense to the charge of sexual battery by restraint. On February 11, 2013, Loren was sentenced to six months in county jail, with credit for 350 days time served.

## II.    DISCUSSION

As noted *ante*, Loren challenges only the admission at trial of his statements to investigating officers. Prior to trial, Loren moved to suppress those statements. On January 22, 2013, the court held an Evidence Code section 402[3] hearing (402 hearing) and received the testimony of Wu and Nannery.

Wu testified that on February 23, 2012, at about 8:40 a.m., he was asked to serve as a Tagalog interpreter for Nannery's interrogation of Loren in a police interview room. Wu was armed and in uniform during the interview. Wu had no training as an interpreter, but considered himself fluent in Tagalog. He was born and raised in the Philippines, and Tagalog was his first language.

Wu first advised Loren of his *Miranda* rights in English, using a police department issued "*Miranda* card." Wu testified that he believed Loren had understood Wu's questions. While Wu did not recall Loren's responses, the transcript (exhibit 47) reflects the following dialogue (italics indicate Tagalog to English translation)[4]:

---

[3] In a criminal action, "the court shall hear and determine the question of the admissibility of a confession or admission of the defendant out of the presence and hearing of the jury if any party so requests." (Evid. Code, § 402, subd. (b).)

[4] Our review is complicated by a limited and somewhat confusing record. An audio recording of Loren's interview, including the *Miranda* admonishments, was played for the trial court. The court was also provided with at least two transcripts of this recording at the 402 hearing: a defense transcript that was represented to have been

Nannery: "Ok good.  Officer here is going to read you your Miranda Right [*sic*] and that's uh he's going to read it to you in Tagalog.  You speak Tagalog?  Good.  Ok, go ahead."

Wu: "Ok, I'm sure you can understand this in English, too.  You have the right to remain silent.  Do you understand?"

Nannery: "You have to say something.  Yes or no?"

Loren: "(*Inaudible*)"[5]

---

prepared by a "state-certified interpreter" (defense exhibit 2); and a transcript that was prepared by the prosecution and provided to defense in discovery (People's exhibit 1A).

On appeal, however, we have not been provided with the recording of Loren's interview.  Although a total of four transcripts of the recording are in the clerk's transcript, we are unable to determine with any certainty which of those transcripts were provided to the trial court at the 402 hearing as those exhibits are not separately marked or otherwise identified in the appellate record.  Three of the four transcripts before us were marked for identification at trial as the People's exhibits 47, 51, and 52 (exhibits 51 & 52 were not admitted into evidence at trial).  The fourth transcript was an exhibit to a September 11, 2012 motion to suppress Loren's statement (motion exhibit), made prior to the first trial.  Exhibit 51 differs from all others in that it transcribes both English and Tagalog in parallel columns.  As discussed *post*, it appears to be *one* of the versions before the court at the 402 hearing.  The defense motion exhibit and exhibit 52 appear to be identical, including a certification of accurate translation executed by a Tagalog translator with a date of April 19, 2012.  While the motion exhibit transcript appears to be the most likely version provided to the court at the 402 hearing, we note that the translator's certificate indicates only that she was an independent contractor for a commercial translation service "fluent in Tagalog" and does not provide evidence of any "state" certification.

In briefing, both Loren and the People cite to exhibit 47, which was the transcript provided to the jury at the second jury trial and the only version admitted into evidence.  At the second trial, the parties stipulated that exhibit 47 contained a correct interpretation of the interview from Tagalog to English.  We therefore primarily rely upon exhibit 47 to the extent it is relied upon by the parties.  However, since we are required to independently examine the record (*People v. Jennings* (1988) 46 Cal.3d 963, 979), we have reviewed all four transcripts.  The principal difference between transcripts is that some translations reflect certain responses, or portions thereof, as inaudible or unintelligible, while others provide actual translations of the same responses.  Relevant differences in transcription are noted.

[5] Transcribed as "Yes" in exhibits 51 and 52 and the motion exhibit.

Wu: "Yes or no. Anything you say may be use [*sic*] against you in court. Do you understand?"

Loren: "Yes."

Wu: "You have a right to a presence [*sic*] of an attorney before and during any questioning. Do you understand?"

Loren: "(*Inaudible*)"[6]

Wu: "If you cannot afford an attorney one will be appointed to you at [*sic*] free of charge before any questioning if you want. Do you understand?"

Loren: "(*Inaudible*)"[7]

Wu: "Ok, do you want me to explain it to you in Tagalog?"

Loren: "*Yes.*"[8]

Wu then read the *Miranda* rights in Tagalog, and then Nannery "broke down each . . . question one by one" with Wu translating into Tagalog.

Wu: "*First question, the question there is, you have the right not to speak if you want. Do you understand?*[9] *The second question, whatever you say to us may be used against you in court. Do you understand?*"

Loren: "(*Inaudible*)"[10]

Wu: "*The third question is if you want an attorney present here while we are questioning you, you can. Do you understand? If you want. Yes or no?*"

Loren: "*I don't know yet.*"[11]

---

[6] Transcribed as "Yes" in exhibit 52 and the motion exhibit.

[7] Transcribed as "Yes" in exhibit 52 and the motion exhibit.

[8] Transcribed as inaudible in exhibit 51.

[9] Exhibit 51 transcribed an inaudible response by Loren.

[10] Exhibit 52 and the motion exhibit transcribed the answer as "Yeah."

[11] Exhibit 51 indicated part of the answer was unintelligible and reads: "*I don't* (UI)."

Wu: *"No the third question is if you want an attorney here before we ask you the questions that we are going to ask you, that is up to you, but the answer we want to hear, yes or no."*

Loren: "Ok. Yes."[12]

Wu: *"Do you want an attorney or do you understand?"*

Loren: "(*Inaudible*)"[13]

Wu: "No you don't need an attorney, but you understand the question. *You understand the question?"*

Loren: "Yes."[14]

Wu: "The third, *if you cannot pay for your own attorney, we can get you an attorney free of charge, if you want. That is the fourth question. Do you understand?"*

Loren: "Yes."[15]

Wu: "Yes."

Nannery: "Just right now, I don't know where you are in the translation here."

Wu: "I'm done here."

Nannery: "Ok essentially just ask him that we would like to hear his side of the story. Go ahead."

Wu: *"Ok, we want to hear your story about what happened earlier."*

Nannery: "We would like to hear your side of the story. We've heard one side of the story. We like to hear your side of the story. Ok. And, and, and hearing your side of the story, you don't have to talk to me. Tell him that. He doesn't have to talk to me."

---

[12] Exhibit 51 indicated part of the answer was unintelligible and reads: "(UI) please."

[13] Exhibit 51 indicated part of the answer was unintelligible and reads: *"No, no.* (UI)." Exhibit 52 and the motion exhibit transcribed the answer as *"No, I don't."*

[14] Exhibit 51 transcribed the answer as *"Uhm hum."*

[15] Exhibit 51 transcribed the answer as *"Uhm hum."*

Wu: "*You don't have to talk to him or you don't need to tell him your side of the story.*"[16]

Nannery: "Ok, you can be quiet if you want. You can remain silent, tell him that."

Wu: "*You can remain silent, if you want.*"

Nannery: "Because what you tell me could be used against you in court."

Wu: "*Whatever you tell him may be used against you in court, against you. Do you understand?*"[17]

Nannery: "Ok, and before you talk to me before I want to hear your side of the story, you have the right to have an attorney here with you if you want."

Wu: "*Before he talks to you, if you like, if you like, like my question earlier, we can give you an attorney if you want.*"

Nannery: "And if you cannot afford an attorney the court will appoint you an attorney for you. Do you understand that?"

Wu: "Do you understand that?"

Loren: "Yes."[18]

Nannery: "So now, what I like to do is I like to get your side of the story and I understand you work at Subway? Do you understand what I just told you? Tell me what I just asked you in English. Do you understand what I just told you?"

Loren: "(*Inaudible*)"[19]

Nannery: "No, ok go ahead."

Wu: "*He would like to hear your side of the story regarding what happened there, including with the lady. We already know what the girl said. He wanted to know. He will ask you questions, answer the question truthfully his question, ok?*"

---

[16] Exhibit 51 transcribed a response by Loren as "Okay."

[17] Exhibit 51 transcribed a response by Loren as "Okay."

[18] Exhibit 51 indicated that Loren's response was unintelligible.

[19] Exhibit 52 and the motion exhibit transcribe the answer as "No."

7

Loren:  "Ok"[20]

Nannery:  "So what did he say?"

Wu:  "He understands it."

Nannery:  "He understands that, that"

Wu:  "That you're going to ask him."

Nannery:  "Ok"

Wu:  "That we want to hear his side of the story."

Loren's counsel argued that the evidence showed that Loren had invoked his right to an attorney, and that any interrogation thereafter was impermissible.  Defense counsel further argued that Wu had not been shown to be a competent interpreter, and that use of any translation provided without use of a competent interpreter would be a violation of Loren's due process rights.  After consideration of authorities cited by the parties, the trial court found that Loren did not make an unequivocal assertion of his right to counsel, and what defense contended was an invocation of the right to counsel was a response "to a very much ambiguous question."  The court ruled  that "based on the totality of the circumstances, the People have shown by a preponderance of the evidence that Mr. Loren was provided with his *Miranda* rights.  And, so, I deny that portion of the motion to exclude Mr. Loren's statements in [*sic*] the morning of February 23rd based on *Miranda* violation."[21]  The court denied Loren's due process claim, finding no authority to support his position and said that the defense would have an opportunity to cross-examine Wu and put on its own evidence of any translation errors.[22]

Loren subsequently moved for reconsideration, arguing that he was not adequately advised of his right to counsel because the trial court found the relevant question by Wu

---

[20] Exhibit 51 did not indicate any response by Loren.

[21] The trial court stated that it had reviewed *three* transcripts of the interview "which all say different things."  From the court's quotations of the transcripts, it appears probable that the third transcript was the transcript later marked at trial as exhibit 51.

[22] Loren does not renew his due process argument here.

8

to be ambiguous.  While describing the issue as a "fairly close call," the court found that any ambiguity had been clarified and denied the motion for reconsideration.

Loren argues on appeal that his statement should have been suppressed because: (1) he was not provided clear and unambiguous *Miranda* warnings; (2) the investigating officers questioned him after he invoked his right to counsel; and (3) under all of the circumstances of the interrogation, any waiver by Loren of his *Miranda* rights and any statements he made were involuntary.

A.     Miranda *Requirements/Standard of Review*

"The admission at trial of a defendant's statements made involuntarily to government officials violates the defendant's federal due process rights under the Fifth and Fourteenth Amendments.  [Citation.]  Similarly, a defendant must be advised of his or her *Miranda* rights, and must make a valid waiver of these rights, before questioning begins or any statements resulting from interrogation can be admitted.  [Citations.]" (*People v. Rundle* (2008) 43 Cal.4th 76, 114, disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.)  When a defendant challenges the admission of his or her statements on the ground they were involuntarily made, the prosecution must prove by a preponderance of the evidence the statements were, in fact, voluntary. (*People v. Guerra* (2006) 37 Cal.4th 1067, 1093; *People v. Dykes* (2009) 46 Cal.4th 731, 751.)

"The rule of *Miranda* is well established:  '[W]hen an individual is taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning, the privilege against self-incrimination is jeopardized. Procedural safeguards must be employed to protect the privilege, and unless other fully effective means are adopted to notify the person of his right of silence and to assure that the exercise of the right will be scrupulously honored, the following measures are required.  He must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.  Opportunity to exercise these

9

rights must be afforded to him throughout the interrogation.  After such warnings have been given, and such opportunity afforded him, the individual may knowingly and intelligently waive these rights and agree to answer questions or make a statement.  But unless and until such warnings and waiver are demonstrated by the prosecution at trial, no evidence obtained as a result of interrogation can be used against him.' " (*People v. Jennings, supra,* 46 Cal.3d at pp. 976–977, quoting *Miranda, supra,* 384 U.S. at pp. 478–479.)

While the four warnings required by *Miranda* are "invariable," the Supreme Court "has not dictated the words in which the essential information must be conveyed." (*Florida v. Powell* (2010) 559 U.S. 50, 60; see also *California v. Prysock* (1981) 453 U.S. 355, 359; *Rhode Island v. Innis* (1980) 446 U.S. 291, 297.)  "In determining whether police officers adequately conveyed the four warnings . . . reviewing courts are not required to examine the words employed 'as if construing a will or defining the terms of an easement.  The inquiry is simply whether the warnings reasonably "conve[y] to [a suspect] his rights as required by *Miranda*." ' [Citations.]" (*Florida v. Powell,* at p. 60.)

"On appeal, we review independently the trial court's legal determinations of whether a defendant's statements were voluntary [citation], whether his *Miranda* waivers were knowingly, intelligently, and voluntarily made [citation], and whether his later actions constituted an invocation of his right to silence [citation].  We evaluate the trial court's factual findings regarding the circumstances surrounding the defendant's statements and waivers, and ' "accept the trial court's resolution of disputed facts and inferences, and its evaluations of credibility, if supported by substantial evidence." ' [Citations.]" (*People v. Rundle, supra,* 43 Cal.4th at p. 115.)  While we must make an independent determination from our review of the record, "we, like the United States Supreme Court, may 'give great weight to the considered conclusions' of a lower court that has previously reviewed the same evidence.  [Citation.]" (*People v. Jennings, supra,* 46 Cal.3d at p. 979.)

B.    *Adequacy of* Miranda *Warnings*

Loren contends that the *Miranda* warnings given in Tagalog and English were inadequate and ambiguous because they did not clearly indicate that he could obtain an attorney free of charge before commencement of any questioning.  He also asserts that the advisement of rights was misleading in its entirety because Wu presented the advisements as questions that Loren was required to answer.  We disagree.

The dialogue between Wu and Loren indicates that Loren was informed in English and Tagalog of his right to have an attorney present during any questioning.  Loren expressed some initial confusion when Wu said, in Tagalog, "*The third question is if you want an attorney present here while we are questioning you, you can.  Do you understand?  If you want.  Yes or no?*"  Loren responded, "*I don't know yet.*"  But Wu then sought clarification, saying "*No, the third question is if you want an attorney here before we ask you the questions that we are going to ask you, that is up to you, but the answer we want to hear, yes or no.*"  Loren then said in English, "Ok.  Yes."[23]  Wu again sought clarification of Loren's response, asking "*Do you want an attorney or do you understand?*" and then "No, you don't need an attorney, but you understand the question. *You understand the question?*"  Loren answered again in English, "Yes."  Loren expressed no confusion when Wu advised him "*if you cannot pay for your own attorney, we can get you an attorney free of charge, if you want.  That is the fourth question.  Do you understand?*"  Loren's response was "Yes," once again in English.  After Nannery asked Loren for his "side of the story," Wu reiterated in Tagalog that "[*y*]*ou don't have to talk to* [*Nannery*] *or you don't need to tell him your side of the story*"; "[*y*]*ou can remain silent, if you want*"; [*w*]*hatever you tell him may be used against you in court, against you.  Do you understand?*";  and "*before he talks to you, if you like, if you like, like my question earlier, we can give you an attorney if you want.*"  Finally, Nannery reminded Loren, in English, that "if you cannot afford an attorney the court will appoint you an attorney for you.  Do you understand that?"  Wu asked Loren (in English) if he

---

[23] Loren spoke mostly in Tagalog but gave some responses in English.

11

understood, and Loren replied (in English) "Yes." In other words, Loren was repeatedly told—and said that he understood—that he had the right to remain silent, that any statements he made could be used against him, and that he had the right to an appointed lawyer prior to any questioning.

Loren cites cases dealing with admonitions that were not only confusing, but also affirmatively misleading. In *U.S. v. Perez-Lopez* (9th Cir. 2003) 348 F.3d 839, the advice of right to counsel was found to be constitutionally infirm because it told the defendant that he could "solicit" the court for counsel, implying the possibility of rejection, and "did not convey to [the defendant] the government's *obligation* to appoint an attorney for an indigent accused." (*Id.* at p. 848.) In *U.S. v. San Juan-Cruz* (9th Cir. 2002) 314 F.3d 384, two different and conflicting sets of warnings were given to the defendant when taken into custody at a border patrol station. The defendant was first read his administrative rights, informing him that he had the right to have an attorney present during questioning but "not at the Government's expense." (*Id.* at p. 386.) Following that, he was read his *Miranda* rights telling him that if he could not afford an attorney, one would be appointed for him. The reviewing court found it would be an unfair burden to require a custodial defendant to resolve the conflicting sets of warnings. (*Id.* at pp. 387–388.) Similar conflicting warnings were given in *U.S. v. Connell* (9th Cir. 1989) 869 F.2d 1349. In order for the warning to be valid, the combination or the wording of its warnings cannot be affirmatively misleading. (*Id.* at p. 1352.)

No such conflicting or equivocal warnings were given to Loren. We find that the warnings given to Loren here reasonably conveyed his rights and "in their totality, satisfied *Miranda*." (*Duckworth v. Eagan* (1989) 492 U.S. 195, 205; see also *Florida v. Powell, supra,* 559 U.S. at p. 60.)

C.      *Invocation of Right to Counsel*

Loren insists that he invoked his right to counsel and unambiguously requested an attorney when he was asked if he wanted counsel. Whether an accused actually invoked his right to counsel is an objective inquiry. (*Davis v. United States* (1994) 512 U.S. 452, 458–459.) " '[A] statement either is such an assertion [of the right to counsel] or it is

12

not.' [Citation.]" (*Smith v. Illinois* (1984) 469 U.S. 91, 97–98.)  Because what Loren said during his police interview is largely undisputed, "we engage in a de novo review of the legal question of whether the statement at issue was ambiguous or equivocal." (*People v. Bacon* (2010) 50 Cal.4th 1082, 1105.)  We conduct our analysis " 'in view of the entire record.' " (*Id*. at pp. 1105–1106.)

The dialogue Loren relied upon in the trial court, and appears to rely upon here, is Loren's response to one of Wu's follow-up questions.  Wu asked:  "*The third question is if you want an attorney present here while we are questioning you, you can.  Do you understand?  If you want.  Yes or no?*"  Loren's initial response was "*I don't know yet.*"  Wu then said:  "*No the third question is if you want an attorney here before we ask you the questions we are going to ask you, that is up to you, but the answer we want to hear, yes or no.*"  Loren then answered in English, "Ok.  Yes."  The trial court found this to be an ambiguous response to an ambiguous question.  We agree.  Contrary to Loren's contention here, it was unclear whether Loren was saying to Wu that "yes," he wanted an attorney, or "yes," he understood the advisement.  Wu attempted to clarify, asking "*Do you want an attorney or do you understand?*"  Loren's response in exhibit 47 was transcribed as inaudible, but transcribed in exhibit 52 and the motion exhibit as "*No, I don't.*"  Wu followed up again, in English and in Tagalog: "No you don't need an attorney, but you understand the question.  *You understand the question?*"  Loren, in English, responded "Yes."

A suspect must unambiguously request counsel and "he must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." (*Davis v. United States*, *supra*, 512 U.S. at p. 459.)  "If 'a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel,' questioning need not cease.  [Citation.]" (*People v. Gonzalez* (2005) 34 Cal.4th 1111, 1127.)  While declining to adopt a rule requiring an officer to ask clarifying questions, the Supreme Court has observed that  "when a suspect makes an ambiguous or equivocal statement it will often be good police practice for the interviewing officers to

13

clarify whether or not he actually wants an attorney." (*Davis v. United States,* at p. 461.) That is what Wu did here. Moreover, Loren did not make even an equivocal request for counsel when reminded by Wu moments later in the interview that "[*b*]*efore he talks to you, if you like, if you like, like my question earlier, we can give you an attorney if you want.*"

We find no clear and unambiguous invocation of the right to counsel by Loren.

D.      *Voluntariness*

Finally, Loren alleges that, under all of the circumstances of this interrogation, his statements and his purported waiver of *Miranda* rights were involuntary. " 'Under both state and federal law, courts apply a "totality of circumstances" test to determine the voluntariness of a confession. [Citation.]' [Citation.]" (*People v. Weaver* (2001) 26 Cal.4th 876, 920.)

Loren notes (without citation to the record) that he was a 22-year-old recent immigrant with no experience with the criminal justice system. Loren points to defense expert testimony at trial that an interrogation is more likely to induce a false confession when the suspect, like Loren, is a person who is culturally influenced to agree with the police and tell them what they want to hear, and that people fear the police in the Philippines because the system is corrupt. Loren also alleges that Wu and Nannery made implied threats during the interrogation, and that the officer's conduct was overtly intimidating.

A statement is involuntary if it is "not ' "the product of a rational intellect and a free will." ' " (*Mincey v. Arizona* (1978) 437 U.S. 385, 398.) "The due process [voluntariness] test takes into consideration 'the totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation.' " (*Dickerson v. United States* (2000) 530 U.S. 428, 434, quoting *Schneckloth v. Bustamonte* (1973) 412 U.S. 218, 226.) This test "examines 'whether a defendant's will was overborne' by the circumstances surrounding the giving of a confession." (*Dickerson v. United States,* at p. 434.) "[C]oercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning

14

of the Due Process Clause of the Fourteenth Amendment." (*Colorado v. Connelly* (1986) 479 U.S. 157, 167.) Coercive police activity, however, " 'does not itself compel a finding that a resulting confession is involuntary.' [Citation.] The statement and the inducement must be causally linked. [Citation.]" (*People v. Maury* (2003) 30 Cal.4th 342, 404–405; see also *People v. Williams* (1997) 16 Cal.4th 635, 659 ["confession or admission is involuntary, and thus subject to exclusion at trial, only if it is the product of coercive police activity"].)

The People argue that Loren has forfeited this issue by failing to seek a determination of voluntariness from the trial court. " ' "[W]here the court, through inadvertence or neglect, neither rules nor reserves its ruling . . . the party who objected must make some effort to have the court *actually rule*. If the point is not pressed and is forgotten, he may be deemed to have waived or abandoned it, just as if he had failed to make the objection in the first place." [Citations.]' [Citation.]" (*People v. Rodgers* (1976) 54 Cal.App.3d 508, 517, fn. omitted.) The People are correct, in part.

At both the initial hearing, and on the motion for reconsideration, Loren argued only the *Miranda* issue.[24] Loren contends that he did not forfeit his claim that his statements were involuntary, because he raised it in his written motion, and submitted the other issues "on his brief." But the focus of Loren's *Miranda* claim in his written papers was that his waiver of rights was not knowing, voluntary and intelligent, and his pleadings sought no other ruling from the trial court. He certainly did not ask the court to rule on whether coercive police activity was present or whether his circumstances made him particularly susceptible to any coercion. A defendant can seek a determination of the voluntariness of any statements made, based on all the circumstances of the interrogation, apart from compliance with *Miranda*. (See *People v. Guerra, supra,* 37 Cal.4th at p. 1094, disapproved on another ground in *People v. Rundle, supra,* 43 Cal.4th at p. 151.) Loren did not. The trial testimony of experts he cites here was not presented to the court

---

[24] As noted *ante*, Loren also argued his due process claim at the first hearing, but he does not pursue that issue here.

in connection with the 402 hearing. Claims of involuntariness on grounds not presented at trial are not preserved for appeal. (*People v. Mayfield* (1993) 5 Cal.4th 142, 172.) Loren forfeited any voluntariness issues apart from his waiver of *Miranda* rights. This is of limited significance, however, since the same inquiries apply when a court evaluates the voluntariness of a *Miranda* waiver. (*Colorado v. Connelly, supra,* 479 U.S. at pp. 169–170.)

Wholly aside from any question of waiver, we find no merit to Loren's assertion that either his waiver of rights or his subsequent statements were involuntary. Loren's discussion of the issue here is at best cursory and conclusory. As we have discussed, evidence before the trial court, and before us, shows that Loren was advised of his rights repeatedly, in both English and Tagalog. Wu repeatedly attempted to clarify whenever Loren exhibited any confusion. We find nothing in the record to indicate that Loren was incapable of freely and rationally choosing to waive his rights and speak with the officers. (See *People v. Frye* (1998) 18 Cal.4th 894, 988, disapproved on another ground in *People v. Doolin, supra,* 45 Cal.4th at p. 421, fn. 22.) Contrary to Loren's assertion, we find no evidence of threats, intimidation or coercion.[25] What Loren cites as "implied threats" are at the midpoint of the interview and are nothing more than statements by the investigators that they did not find Loren's explanations credible, and that he had only given them "a little bit of truth." Nannery and Wu told Loren that he was "not a bad guy" and they did not want to see him "lying, and get [him]self into more trouble." The "overt intimidation" Loren references are two sentences by Nannery, reflected by the transcript near the conclusion of the interview and characterized by Loren as "yelling," in which Nannery said, "Stand up, stand up over here," and "Stand up, stand up! Stand over here,

---

[25] Loren's contention that his statements and any waiver were involuntary based on his cultural experiences in the Phillipines, even if not waived, is irrelevant. "The due process inquiry focuses on the alleged wrongful and coercive actions of the state . . . and not the mental state of defendant. [Citation.]" (*People v. Weaver, supra,* 26 Cal.4th at p. 921; see also *People v. Bradford* (1997) 14 Cal.4th 1005, 1041 [5th Amend. "is not 'concerned with moral and psychological pressures to confess emanating from sources other than official coercion' "].)

16

sit down." Accepting Loren's characterization, Loren does not attempt to establish how his free will was overborne by the coercion or to show the requisite causal link between any specific statements Loren made and the alleged intimidation or coercion. (*People v. Maury, supra,* 30 Cal.4th at pp. 404–405.) Loren said nothing following the "yelling" that he had not said earlier in his statement.

The evidence supports a finding that Loren's waiver of *Miranda* rights was knowingly, intelligently, and voluntarily made, and his statement was properly admitted at trial.

### III.   DISPOSITION

The judgment is affirmed.

_____
Bruiniers, J.

We concur:

_____
Simons, Acting P. J.

_____
Needham, J.