Filed 5/18/22 (unmodified opn. attached)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, Plaintiff and Respondent, v. JAIME JEZZUEL LOPEZ, Defendant and Appellant. | G060261 (Super. Ct. No. 08NF3673) ORDER MODIFYING OPINION AND DENYING PETITION FOR REHEARING; NO CHANGE IN JUDGMENT |

It is ORDERED that the opinion filed on April 28, 2022, be modified as follows:

On page 22, after the second full paragraph ending with "The jury might have rejected the prosecution's theory and arguments that defendant acted alone." Insert the following two paragraphs:

The Attorney General points out the trial court did not instruct the jury with CALCRIM No. 703, which sets forth the requirements for finding a defendant who is not the actual killer to be guilty of special circumstance murder. The Attorney General also points out the bench notes to CALCRIM No. 703 state the trial court has a sua sponte duty to give this instruction if there is substantial evidence that the defendant was not the actual killer; conversely, the bench notes advise not to give the instruction if accomplice liability is not an issue in the case. (Judicial Council of Cal. Crim. Jury

Instns. (2021) Bench Notes to CALCRIM No. 703.) The Attorney General argues the trial court did not instruct with CALCRIM No. 703 "presumably because accomplice liability was not an issue in the case and there was no substantial evidence to support the instructions."

The trial court's decision not to give CALCRIM No. 703 is not dispositive in determining whether defendant made a prima facie case for relief under section 1170.95. The issue is whether the record of conviction conclusively establishes as a matter of law that defendant was the actual killer; that is, defendant personally killed the victim. The jury would not have been aware of CALCRIM instructions other than those given and would not have known of any bench notes. The evidence presented at trial, in particular defendant's own testimony, and the instructions actually given did not establish defendant was the actual killer as a matter of law but created the possibility the jury found defendant guilty of murder without finding him to be the actual killer."

The petition for rehearing is DENIED.

The modification does not change the judgment.

SANCHEZ, J.

WE CONCUR:

O'LEARY, P. J.

ZELON, J.*

*Retired Justice of the Court of Appeal, Second Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

2

Filed 4/28/22 (unmodified opinion)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G060261 |
| v. | (Super. Ct. No. 08NF3673) |
| JAIME JEZZUEL LOPEZ, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a postjudgment order of the Superior Court of Orange County, Andre Manssourian, Judge.  Reversed and remanded.

Eric Multhaup, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Anthony DaSilva and Steve Oetting, Deputy Attorneys General, for Plaintiff and Respondent.

\*          \*          \*

## INTRODUCTION

In 2011, a jury convicted Jaime Jezzuel Lopez of the first degree murder of Reginold Harry and found true a special circumstance allegation that the murder had occurred during the commission of a robbery.  The trial court sentenced defendant to a term of life without the possibility of parole.  A panel of this court affirmed the conviction in an unpublished opinion in *People v. Lopez* (Aug. 26, 2013, G046477).

Defendant appeals from an order denying his petition for resentencing under Penal Code section 1170.95.[1]  He contends he made a prima facie case for relief by showing it was possible the jury had convicted him of felony murder and found the robbery-murder special-circumstance allegation to be true without finding he was the victim's actual killer.

We conclude the term "actual killer" as used in the revised felony-murder rule of section 189, subdivision (e)(1) refers to someone who personally killed the victim and is not necessarily the same as a person who "caused" the victim's death.  Under this meaning of actual killer, it was possible for the jury to have found defendant guilty of felony murder, and found to be true the robbery-murder special-circumstance allegation, without finding defendant was the actual killer.  Defendant therefore met his burden of making a prima facie case for relief under section 1170.95.  Accordingly, we reverse the order denying defendant's petition for resentencing and remand with directions to the trial court to issue an order to show cause and conduct an evidentiary hearing.

## FACTS

The underlying facts are set forth in *People v. Lopez, supra*, G046477:

"In 2001, police officers observed the victim, Reginold Harry, in an area where homosexual men would meet to commit lewd acts.  Reginold told the officers he

---

[1]  All statutory references are to the Penal Code.

2

was bisexual.  In 2004, police officers observed Reginold in a different meeting area for homosexual men.

"In 2003, police officers observed defendant in an area where homosexual men would meet to commit lewd acts.  Defendant told an officer he was homosexual.  In 2006, defendant was parked at the A to Z adult bookstore in Garden Grove (a meeting area for homosexual men) and told an officer that he was waiting for a male prostitute to approach him.

"In June 2007, Reginold lived with his wife of 16 years, Annie, and their two sons in a one-bedroom apartment in Fullerton, California.  The whole family slept in the apartment's single bedroom, with Annie sharing a large bed with their younger son, while Reginold and the older son slept on a bunk bed's bottom and top bunks, respectively.  At the time, Reginold and Annie had not had marital relations for a year and a half or more.

"Annie worked as a dietician assistant at a local hospital, and had previously been trained and worked as a nurse in other countries.  Annie would leave the apartment at 6:00 a.m.  because she worked from 6:30 a.m. to 1:00 p.m. at the hospital.  Reginold worked at night doing data entry at a laboratory, usually from 9:00 p.m. to 5:00 a.m.  Their older son was a high school sophomore and their younger son was in elementary school.

"The morning of June 4, 2007, Annie woke up at 4:45 a.m.  The apartment was tidy, as Annie always maintained a very tidy home.  Reginold and the two sons were sleeping when Annie left for work at 5:45 a.m.  Shortly before 7:00 a.m., the older son left to walk to school.  The apartment was still clean and tidy.  Between 7:30 and 7:45 a.m., Annie phoned Reginold to ask whether their younger son was going to school even though his legs had hurt the day before.  Reginold said their younger son was going to school and was fine.  Reginold drove the boy to school.  Before dropping his son off, Reginold said, 'Bye, [son], I love you.'

3

"At about 1:15 p.m., Annie arrived home from work and parked downstairs in front of her apartment. She looked up at her second floor apartment and was surprised to see the curtains drawn on the bedroom and living room windows, which was unusual. Annie walked upstairs and opened the apartment's front door. Strewn on the floor were the contents of a living room cabinet and the cabinet under the kitchen sink. The cabinet doors were open.

"Annie called out, 'Reggie? Reggie?' Hearing no answer, she rushed to the bedroom. The bedroom door was locked; normally, it was never even closed. A computer on a nearby desk was turned over. Annie knocked on the bedroom door and called, 'Open the door, Reggie.' Hearing no answer, she phoned the building manager and asked for someone to come open the door. She grabbed a screwdriver and tried to remove the door knob, but the knob fell inside while the latch stayed closed.

"The apartment building's repairman arrived. Annie seemed very nervous and asked him to quickly open the door. The repairman disengaged the latch and opened the bedroom door.

"Annie rushed inside the bedroom. The room was dark because the curtain was drawn. Dresser drawers were open. Items were scattered on the floor. The closet door was slid partially open.

"Annie rushed to the bed and saw a naked Reginold laying down on his stomach. The white satin bedspread was red with blood. Annie shook Reginold hard and screamed, 'Reggie, get up. Reggie, talk to me.' She checked his neck for a pulse but there was none. One side of his head had no hair and was totally white. Annie saw something on one side of the bed, touched it, and realized it was a patch of skin and hair.

"The repairman was leaving the apartment when he heard Annie yelling, followed by a high-pitched shrill scream. He returned to the bedroom to ensure she was safe. He saw a body on the bed. After confirming that Annie had phoned 911, the repairman went to the manager's office to report the incident.

"The police arrived within 10 minutes and found no signs of a forced entry into the ransacked apartment.

"On the lower bunk bed were a box of condoms, a bottle of lubricant, and a black belt. Underneath the mattress were two heterosexual pornographic DVD's. Two pools of blood had seeped through a number of comforters and sheets onto the mattress. On a dresser drawer at the head of the bed was a blood swipe (where an object with blood is rubbed against another object and transfers blood onto it). There was blood cast-off (which occurs when a bloody [object] is moved and the blood is cast off in a blood stain pattern) throughout the bedroom — on virtually every wall, the ceiling, the bedspread, the pillows, a dresser, the blinds, the closet doors, a crucifix, and a picture of Mahatma Gandhi. The blood cast-off on the wall behind the bed and the window area was consistent with the perpetrator being behind the victim on the bed and hitting with the left or right hand and then pulling back and hitting again a number of times. There was blood spatter (which occurs when an object makes contact with blood causing the blood to splash off onto an area) on a bedroom wall and a pillow. Three of Annie's purses were on the bed, instead of in their normal place in a closet. The purses on the bed next to the blood-spattered pillow had no blood on them.

"A DNA sample was taken from a drinking glass in the bedroom. The DNA swab was properly maintained and kept at the crime lab and the chain of custody was maintained throughout the testing process.

"Annie normally kept a black jewelry case and two plastic boxes of jewelry in a bedroom closet. Now all of her 22 karat gold jewelry was gone, along with $700 to $800 in cash and a bag containing her video camera and all the cassettes recording memories dating from her sons' birth up to that day. Also missing were surgical gloves and a roll of trash bags from the kitchen, Reginold's wallet, and a crystal cross that had been on a nightstand at the foot of the bed.

5

"Annie later gave the police an identical crucifix that belonged to her sister. Annie found a homosexual men's magazine and a men's workout magazine underneath the carpet in the trunk of Reginold's car, which she gave the police. She gave them a bank statement showing a May 21, 2007 withdrawal for $22 from an automatic teller machine at the A to Z Bookstore in Garden Grove. At police request, a flyer was posted at the A to Z Bookstore with Reginold's photo and a synopsis of the incident.

"Reginold's autopsy revealed he had suffered 13 lacerations to the left side and back of his head. Beneath the lacerations, hemorrhaging had occurred and the temporal bone was fractured down to the base of his skull. The injuries to Reginold's skull were consistent with his having been struck several times with the edges of the crystal cross, which weighed about three pounds. Reginold also had superficial injuries to his left shoulder and upper back, as well as defensive wounds on his right hand. There was no evidence of sexual trauma to his anus. His death was caused by severe blunt force head trauma.

"Almost six weeks later, on July 16, 2007, officers arrived at a home on Donna Lane in Garden Grove in response to a report of a disturbance. The home was located 10 miles from the Harrys' apartment in Fullerton and 4.6 miles from the A to Z Bookstore in Garden Grove.

"The homeowner, Eladio Alvarez, told an officer that defendant rented a studio/garage in the backyard. Defendant lived there with his friend, an Asian man. Defendant never paid the $600 rent during the three months he was there because he said he was unemployed. Most of the backyard was off limits to defendant and his friend because defendant was not paying his rent.

"Alvarez had told his daughter to phone the police because defendant was arguing with his friend. Alvarez had told defendant he was going to call the police. Prior to the police arriving, defendant asked Alvarez if he (defendant) could leave some items at the house but Alvarez refused. About five minutes before the officers arrived,

6

Alvarez's daughter saw defendant going back and forth from the studio/garage to the back of a shed in the backyard; she thought this was unusual because defendant was not allowed to go there.

"Defendant told the police that he was in a relationship with Trung Pham, they lived together at the studio, and they had recently broken up. After talking with defendant about the dispute, an officer told defendant to leave the Alvarez residence.

"The next day, Alvarez was doing yard work in the backyard when he found two backpacks behind a storage shed. Alvarez had previously seen defendant and Pham with the backpacks. Alvarez called the police. The responding officer saw a box of latex gloves on top of one blue backpack. Inside the backpack was a large black plastic Samsonite case filled with jewelry. Inside the other backpack was a laptop computer, computer equipment, a Sprint pocket personal computer, jewelry inside some small bags, a letter addressed to defendant, a driver's license renewal application for Pham, and a 2004 tax return for a woman who did not know either defendant or Pham. The jewelry and watches were eventually sent to an auction company to be sold pursuant to police policy, because they had not been claimed. The auction company inventoried the items and took photographs of the jewelry and watches.

"Defendant's DNA standard was properly maintained and kept at the crime lab and the chain of custody was maintained throughout the testing process. DNA testing revealed defendant was the major contributor of DNA on the drinking glass found in the bedroom on the day of Reginold's murder. In July 2008, the lead investigator in the murder case was informed of the DNA match.

"In August 2008, Annie went to the police station to look at photographs to see if any of the jewelry taken from her home in 2007 was depicted in those photographs. She identified three pieces of jewelry as definitely belonging to her and a watch as resembling one of hers, although she could not definitively identify it as hers without seeing the watch.

7

"*Defense*

"Defendant testified in his own defense as follows. He had been to the Fullerton apartment just once. He went there with his friend and drug dealer, Ivan Argueta. Prior to June 2007, Argueta had sold defendant crystal methamphetamine more than 20 times. At that time, defendant had been using methamphetamine for about two years. Defendant and Argueta are both homosexual, and they attended gay clubs together.

"On the day in question, Argueta came to defendant's home unannounced, woke him up, and asked defendant to help Argueta move out of his boyfriend's apartment because Argueta and his boyfriend had had a fight. Argueta was high and freaking out. Argueta drove defendant to the apartment in Argueta's white Mustang. Argueta opened the door to the apartment and defendant followed him inside. Drawers were open and stuff was on the floor. Argueta told defendant to stay in the living room; defendant sat down on the couch. Argueta 'went somewhere inside.' Defendant heard Argueta moving around in the other room. Defendant shouted to Argueta in the other room, asking what he was doing, what was all this mess, and where was the bathroom. Defendant could not recall what Argueta was saying; Argueta 'was just screaming.' Defendant used the bathroom and then returned to the living room. He went to the kitchen, got a glass and some water from the sink, drank the water, and put the glass down on the kitchen counter. He did not go into the bedroom or place the glass on any bedroom furniture. Defendant started 'freaking out about the place being a mess.' It bothered him that Argueta was getting back at his boyfriend by making such a mess. He told Argueta that he wanted to leave. Argueta told defendant to take three pieces of luggage away in Argueta's car. Defendant said he was not coming back for Argueta. Argueta said, 'Just take my car, don't worry.' Argueta stayed at the apartment. Defendant drove home, left the luggage in the Mustang, and went inside to sleep.

8

Sometime that afternoon, Argueta came and woke defendant up. Argueta asked defendant for the car keys. Argueta then left.

"That evening, Argueta returned and gave defendant two plastic grocery bags containing about 12 pieces of jewelry. Defendant and Argueta talked about money that Argueta had borrowed from defendant. (Defendant had pawned a computer and printer to get the money to lend to Argueta). Argueta left and defendant never saw him again.

"On the day defendant fought with Pham, defendant hid the backpacks behind the storage shed because he and Pham had stuff in there they did not want the police to find. They had been committing credit card fraud and identity theft by stealing mail from mailboxes. Pham's cell phone, iPod, and defendant's computer were in one backpack. Defendant subsequently went to the police department to ask that his property be returned but was told it had either been donated to charity or sold.

"Defendant admitted that in 2008 he was convicted of felony fraud in Orange County. In October 2008, a police detective showed defendant a photograph of the Harry apartment. Defendant denied having been there because at 'that point in time [he] didn't recognize the place.' When defendant was shown a photograph of Reginold, defendant first said he did not recognize that person. Defendant later told the detectives that he recognized Reginold from a flyer he saw at the A to Z Bookstore.

"The defense also called a police detective as a witness. The detective testified that he interviewed defendant in October 2008 regarding the June 2007 incident at the Fullerton apartment. Defendant told the detective that it had been about four to five years since he had been in Fullerton. The detective showed defendant a photograph of the Fullerton apartment and mentioned there was scientific evidence linking him to the location. Eventually defendant admitted he was there and gave the version of events involving Argueta. Defendant told the detective that when he was in the apartment, he

9

went to the kitchen, filled up a glass of water, and drank some. At that time, the detective had not told defendant that his DNA was found on a drinking glass in the apartment.

"The detective found a July 20, 2007 traffic citation in which Argueta had provided a Fullerton address to a police officer. The address was located two to three miles from the Harrys' Fullerton apartment. The detective verified that Argueta did indeed own a white Mustang and located him in Mexico. A Spanish-speaking officer interviewed Argueta in Mexico and obtained samples of Argueta's hair and saliva. Tests showed that Argueta's DNA was not present in the Fullerton apartment." (Fn. omitted.)

## PROCEDURAL HISTORY

In December 2011, the jury convicted defendant of first degree murder (§ 187, subd. (a), former § 189) and found true the special circumstance allegation the murder was committed while defendant was engaged in the commission of a robbery (§ 190.2, subd. (a)(17)(A)). The trial court sentenced defendant to life without the possibility of parole.

In January 2021, defendant, representing himself, filed a petition for resentencing under section 1170.95. The trial court appointed counsel to represent defendant. The district attorney, on behalf of the People, filed a response to the petition for resentencing and requested a summary denial.

A hearing was conducted at which both defendant and the district attorney submitted on the papers. The trial court found defendant had failed to make a prima facie case for relief and denied his petition for resentencing. In making its decision, the trial court considered the information, the jury instructions given, the verdicts, the prior opinion in *People v. Lopez, supra*, G046477, and a transcript of closing arguments at trial. The court minutes recite these reasons for the court's decision: "A review of court records indicates defendant is not eligible for relief under the statute because defendant's

10

murder conviction is not based on felony-murder or on a natural and probable consequences theory of vicarious liability for aiders and abettors."

## DISCUSSION

### I.  Relevant Law:  Senate Bill No. 1437

#### A.  *Substantive Changes to the Law of Vicarious Liability for Murder*

"Effective January 1, 2019, the Legislature passed Senate Bill [No.] 1437 [(Stats. 2018, ch. 1015, §§ 2-4)], 'to amend the felony murder rule and the natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life.'"  (*People v. Lewis* (2021) 11 Cal.5th 952, 959 (*Lewis*).)

Senate Bill No. 1437 substantially modified the law relating to vicarious liability for murder by eliminating the natural and probable consequences doctrine as a basis for finding a defendant guilty of murder (*People v. Gentile* (2020) 10 Cal.5th 830, 842-843) and by narrowing the scope of felony murder (§§ 188, subd. (a)(3), 189, subd. (e)).

Senate Bill No. 1437 eliminated the natural and probable consequences doctrine by adding the following language to section 188:  "Except as stated in subdivision (e) of Section 189, in order to be convicted of murder, a principal in a crime shall act with malice aforethought.  Malice shall not be imputed to a person based solely on his or her participation in a crime."  (§ 188, subd. (a)(3); see *People v. Gentile, supra*, 10 Cal.5th at pp. 842-843.)  To modify the felony-murder rule, Senate Bill No. 1437 added section 189, subdivision (e) (section 189(e)), which states:  "(e) A participant in the perpetration or attempted perpetration of a felony listed in subdivision (a) in which a death occurs is liable for murder only if one of the following is proven:  [¶] (1) The

11

person was the actual killer.  [¶] (2) The person was not the actual killer, but, with the intent to kill, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted the actual killer in the commission of murder in the first degree.  [¶] (3) The person was a major participant in the underlying felony and acted with reckless indifference to human life."

## B.  *Procedure Under Section 1170.95*

"In addition to substantively amending sections 188 and 189 of the Penal Code, Senate Bill [No.] 1437 added section 1170.95, which provides a procedure for convicted murderers who could not be convicted under the law as amended to retroactively seek relief."  (*Lewis, supra*, 11 Cal.5th at p. 959.)  That procedure begins with the offender filing a petition that alleges:  "(1) A complaint, information, or indictment was filed against the petitioner that allowed the prosecution to proceed under a theory of felony murder or murder under the natural and probable consequences doctrine[;]  [¶] (2) The petitioner was convicted of first degree or second degree murder following a trial or accepted a plea offer in lieu of a trial at which the petitioner could be convicted for first degree or second degree murder[;]  [¶] [and] (3) The petitioner could not be convicted of first or second degree murder because of changes to Section 188 or 189 made effective January 1, 2019."  (Former § 1170.95, subd. (a)(1)-(3).)

The petition must be filed in the sentencing court, and must include the petitioner's declaration showing eligibility, the case number, the year of conviction, and any request for counsel.  (§ 1170.95, subd. (b).)  If the petition satisfies those technical requirements, then the trial court appoints counsel if the petitioner has requested counsel. (*Id*., subd. (b)(3); see *Lewis, supra,* 11 Cal.5th at p. 957.)[2]  Next, "[t]he prosecutor shall

---

[2]  When the trial court appointed counsel for defendant, the requirement of appointment of counsel was contained in subdivision (c) of section 1170.95.  (See former § 1170.95, subd. (c).)  The requirement of appointment of counsel is now set forth in

12

file and serve a response," and "[t]he petitioner may file and serve a reply within 30 days after the prosecutor's response is served." (§ 1170.95, subd. (c).)

Once briefing is completed, the trial court determines whether the petitioner has made a prima facie case for relief. (§ 1170.95, subd. (c).) If the court finds the petitioner has made a prima facie case, then the court must issue an order to show cause. (*Ibid.*)

In determining whether the petitioner has made a prima facie case for relief under section 1170.95, the trial court's inquiry is limited: The court, accepting the petition's factual allegations as true, makes a """"preliminary assessment"""" whether the petitioner would be entitled to relief if those allegations were proven. (*Lewis, supra*, 11 Cal.5th at p. 971.) """"If so, the court must issue an order to show cause."""" (*Ibid.*) Within 60 days of issuance of the order to show cause, the trial court must hold a hearing to determine whether the petitioner is entitled to relief. (§ 1170.95, subd. (d)(1).)

### C. *Use of the Record of Conviction to Determine Whether Petitioner Has Made a Prima Facie Case for Relief*

After counsel is appointed, and the parties are given the opportunity for briefing, the trial court may rely on the record of conviction to determine whether the petitioner has made a prima facie case for relief under section 1170.95. (*Lewis, supra*, 11 Cal.5th at p. 957.) "The record of conviction will necessarily inform the trial court's prima facie inquiry under section 1170.95, allowing the court to distinguish petitions with potential merit from those that are clearly meritless." (*Id.* at p. 971.) "In sum, the parties can, and should, use the record of conviction to aid the trial court in reliably assessing whether a petitioner has made a prima facie case for relief under subdivision (c) [of section 1170.95]." (*Id.* at p. 972.)

___

section 1170.95, subdivision (b)(3), which grants a petitioner the right to appointment of counsel, if requested, upon the filing of a facially sufficient petition.

13

"In reviewing any part of the record of conviction at this preliminary juncture, a trial court should not engage in 'factfinding involving the weighing of evidence or the exercise of discretion.'" (*Lewis, supra*, 11 Cal.5th at p. 972.) "While the trial court may look at the record of conviction after the appointment of counsel to determine whether a petitioner has made a prima facie case for section 1170.95 relief, the prima facie inquiry under subdivision (c) is limited. Like the analogous prima facie inquiry in habeas corpus proceedings, '"the court takes petitioner's factual allegations as true and makes a preliminary assessment regarding whether the petitioner would be entitled to relief if his or her factual allegations were proved. If so, the court must issue an order to show cause."' [Citations.] '[A] court should not reject the petitioner's factual allegations on credibility grounds without first conducting an evidentiary hearing.' [Citations.] 'However, if the record, including the court's own documents, "contain[s] facts refuting the allegations made in the petition," then "the court is justified in making a credibility determination adverse to the petitioner."'" (*Id*. at p. 971.)

The record of conviction may include the underlying facts as presented in an appellate opinion, the trial evidence, the jury instructions, and closing arguments of counsel. (*People v. Ervin* (2021) 72 Cal.App.5th 90, 99, 102.) However, "the probative value of an appellate opinion is case specific, and 'it is certainly correct that an appellate opinion might not supply all answers.'" (*Lewis, supra*, 11 Cal.5th at p. 972.)

## II. Standard of Review

The trial court denied defendant's resentencing petition on the ground defendant had failed to make a prima facie case for resentencing relief. "'A denial at that stage is appropriate only if the record of conviction demonstrates that "the petitioner is ineligible for relief as a matter of law." [Citations.] This is a purely legal conclusion, which we review de novo.'" (*People v. Ervin, supra*, 72 Cal.App.5th at p. 101.)

14

A petitioner is ineligible for resentencing as a matter of law if the record of conviction conclusively establishes, with no factfinding, weighing of evidence, or credibility determinations, that (1) the petitioner was the actual killer, or (2) the petitioner was not the actual killer, but, with the intent to kill, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted the actual killer in the commission of murder in the first degree, (3) the petitioner was a major participant in the underlying felony and acted with reckless indifference to human life, or (4) the petitioner acted with malice aforethought that was not imputed based solely on participation in a crime. (§§ 188, subd. (a)(3), 189(e); see *Lewis, supra,* 11 Cal.5th at p. 971; see also *People v. Gentile, supra*, 10 Cal.5th at pp. 842-843.)

## III.  Defendant Met His Burden of Making a Prima Facie Case for Relief Under Section 1170.95

### A.  *Narrowing the Possible Grounds for Eligibility for Relief to Felony Murder*

We start our analysis by narrowing the grounds on which defendant is potentially eligible for relief.  The jury was instructed that defendant was being prosecuted for murder under two theories:  (1) malice aforethought and (2) felony murder.  The jury returned two verdicts.  The first verdict found defendant guilty of first degree murder.  The first verdict does not indicate whether the jury found defendant guilty of malice aforethought murder or felony murder.  The second verdict found to be true a robbery-murder special-circumstance allegation under section 190.2, subdivision (a)(17) (section 190.2(a)(17)).

The verdicts leave two possibilities:  (1) the jury found defendant guilty of first degree malice aforethought murder with a robbery-murder special circumstance, or (2) the jury found defendant guilty of first degree felony murder with a robbery-murder special circumstance.

15

If the jury found defendant guilty of malice aforethought murder, he would be ineligible for relief as a matter of law because section 1170.95 affords relief only to those convicted of felony murder, murder under the natural and probable consequences doctrine,[3] or murder under any other theory under which malice is imputed based on a person's participation in a crime.  (§ 1170.95, subd. (a).)  That leaves the conviction for felony murder as the possible basis for relief under section 1170.95.[4]

### B.  *It Was Possible the Jury Convicted Defendant of Murder Without Finding He Was the Actual Killer*

Defendant could be convicted of felony murder under section 189(e), and therefore ineligible for relief under section 1170.95, if he were (1) the actual killer, or (2) though not the actual killer, acted with intent to kill and aided or abetted the actual killer in committing the murder, or (3) was a major participant in the underlying felony and acted with reckless indifference to human life.  (§ 189(e).)

---

[3]  Defendant was not prosecuted under the natural and probable consequences doctrine, the prosecutor did not argue the natural and probable consequences doctrine, and the jury was not instructed on it.  The jury was instructed on natural and probable consequences with respect to cause of death (the death was the natural and probable consequence of an act by defendant) and with respect to implied malice.  But that is not the same as the doctrine under which an aider and abettor can be held liable for a nontarget offense that was a natural and probable consequence of the target offense.  (See *People v. Chiu* (2014) 59 Cal.4th 155, 161-162.)

[4]  The same facts may serve as the basis to establish both a first degree felony-murder conviction and a robbery-murder special circumstance finding.  (*People v. Abilez* (2007) 41 Cal.4th 472, 528; *People v. Marshall* (1990) 50 Cal.3d 907, 945-946.)  The Attorney General does not argue the true finding on the robbery-murder special-circumstance allegation bars relief under section 1170.95 as a matter of law.  There is an ever-growing split of authority on that subject.  (See, e.g., *People v. Galvan* (2020) 52 Cal.App.5th 1134, 1140-1141 [true finding on felony-murder special-circumstance allegation categorically bars resentencing relief], review granted, Oct. 14, 2020, S264284; contra, e.g., *People v. Mejorado* (2022) 73 Cal.App.5th 562, 570-571 [special circumstance true finding is not a categorical bar to resentencing relief], review granted Mar. 23, 2022, S273159.)

16

Defendant was prosecuted solely under the theory he was the actual killer and committed the robbery alone. The jury was not instructed on accomplice liability, aider and abettor liability, or on liability under the theory defendant counseled, commanded, induced, solicited, requested, or assisted the actual killer in the commission of murder in the first degree or robbery. The jury was not instructed on liability by virtue of defendant having been a major participant in the underlying felony. The instructions for felony murder (CALCRIM No. 540A) and robbery-murder special circumstance (CALCRIM No. 730) had been modified to eliminate all theories of liability other than defendant having committed robbery. Those instructions had been modified to tell the jury the prosecution had to prove "[t]he defendant *committed* robbery" (italics added) which is the language recommended by the bench notes to CALCRIM No. 730 if the prosecution's theory is the defendant committed the underlying felony. (Judicial Council of Cal. Crim. Jury Instns. (2021) Bench Notes to CALCRIM No. 730, p. 460.) The prosecutor argued in closing that defendant was the actual killer *and* committed the robbery. The prosecutor argued, "[N]ot only did this man, Jaime Lopez, take [the victim]'s life, he took his wallet and he took his wife's jewelry."

Defendant's theory at trial was that he was neither the actual killer nor involved in the robbery. Defendant testified that although he went with Argueta to victim's apartment, he did not kill the victim or participate in the robbery or even enter the bedroom in which the victim was later found. (*People v. Lopez, supra*, G046477.)

The jury was instructed with CALCRIM No. 540A that to find defendant guilty of felony murder, it had to find he committed robbery and "[w]hile committing robbery, the defendant *caused the death of another person*." (Italics added.) The jury was instructed with CALCRIM No. 730 that to find the robbery-murder special-circumstance allegation to be true, the jury had to find defendant "did an act that *caused the death of another person*." (Italics added.) On the subject of causation, the trial court instructed the jury as follows: "An act causes death if the death is the direct,

17

natural, and probable consequence of the act and the death would not have happened without the act. A natural and probable consequence is one that a reasonable person would know is likely to happen if nothing unusual intervenes."

Thus, by returning guilty verdicts and a true finding on the robbery-murder special circumstance, the jury necessarily found that defendant "caused the death of another person" and "did an act that caused the death of another person." The jury necessarily found that the victim's death was the direct, natural, and probable consequence of defendant's act and the death would not have happened without the act.

But in order for defendant to be liable for felony murder under section 189(e), based on the prosecution's theory and the instructions given, defendant would have to have been the "actual killer." (§ 189(e)(1).) What does it mean to be the actual killer for purposes of section 189(e)(1) of the revised felony-murder rule? Is a defendant the actual killer under section 189(e)(1) solely by virtue of being the proximate cause of the victim's death?

The California Supreme Court has used the term "personally killed" in referring to an actual killer's liability for felony-murder special circumstance. Thus, "[a] felony-murder special circumstance is established even absent intent to kill, premeditation, or deliberation, if there is proof beyond a reasonable doubt that the defendant *personally killed* the victim in the commission or attempted commission of, and in furtherance of, one of the felonies enumerated in subdivision (a)(17) of section 190.2." (*People v. Jennings* (1988) 46 Cal.3d 963, 979, italics added.) Passages from the Legislative history of Senate Bill No. 1437 suggest the Legislature, in revising the law of felony murder and accomplice liability for murder, intended actual killer to have that same meaning; that is, someone who personally killed the victim. (See Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading of Sen. Bill No. 1437 (2017-2018 Reg. Sess.) as amended May 25, 2018, p. 1 ["[t]his bill revises the felony murder rule to prohibit a participant in the commission or attempted commission of a felony that has been

18

determined as inherently dangerous to human life to be imputed to have acted with implied malice, unless he or she personally committed the homicidal act"]; Sen. Com. on Public Safety, Rep. on Sen. Bill No. 1437 (2017-2018 Reg. Sess.) as introduced Feb. 16, 2018, p. 2 ["[t]he purpose of this bill is to revise the felony murder rule to prohibit a participant in the commission or attempted commission of a felony that has been determined as inherently dangerous to human life to be imputed to have acted with implied malice, unless he or she personally committed the homicidal act"]; see also Assem. Com. on Public Safety, Rep. on Sen. Bill No. 1437 (2017-2018 Reg. Sess.) as amended May 25, 2018, pp. 5-6 ["[u]nder the provisions of this bill, an individual would not be liable for 2nd [degree] murder under a theory of felony murder unless the individual personally committed the act that resulted in death"].)

The distinction between the concept of being the actual killer and committing an act that causes death is found in other areas of criminal law. The jury in the present case was instructed with CALCRIM No. 520 (murder first and second degree), which states as the first element: "The defendant committed an act that caused the death of another person." Liability for murder may be imposed in some circumstances against a person who is not the actual killer but who commits an act that is the proximate cause of the victim's death. (E.g., *People v. Roberts* (1992) 2 Cal.4th 271, 315-321.) "In homicide cases, a 'cause of the death of [the decedent] is an act or omission that sets in motion a chain of events that produces as a direct, natural and probable consequence of the act or omission the death of [the decedent] and without which the death would not occur.'" (*People v. Cervantes* (2001) 26 Cal.4th 860, 866.) "Proximately causing and personally inflicting harm are two different things. The Legislature is aware of the difference." (*People v. Bland* (2002) 28 Cal.4th 313, 336; see *People v. Valenzuela* (2010) 191 Cal.App.4th 316, 321 ["Case law establishes that proof a defendant proximately caused great bodily injury does not constitute proof the defendant personally inflicted such injury"].) The Legislature was aware of that

19

difference when it chose to use the term actual killer in enacting Senate Bill No. 1437 to add section 189(e).

The Court of Appeal in *People v. Garcia* (2020) 46 Cal.App.5th 123, 151 (*Garcia*) concluded the term actual killer as used in section 190.2, subdivision (b) (section 190.2(b)) means someone who personally killed the victim and does not necessarily mean a person who caused the victim's death. In *Garcia*, two defendants were convicted of first degree murder and, as to one defendant (Austin), found to be true a robbery-murder special-circumstance allegation under section 190.2(a)(17). (*Garcia,* at pp. 130-131.) There was evidence showing that, during a home invasion robbery, Austin handed duct tape to the other defendant, who placed duct tape over the victim's mouth, causing the victim to die from suffocation. (*Id.* at pp. 134-135, 145.) At trial, the prosecutor argued Austin was an "actual killer" because his act of handing the duct tape to the other defendant caused the death of the victim. (*Id.* at p. 149.) The trial court in *Garcia* instructed the jury with CALCRIM No. 730 (*Garcia,* at p. 144), as did the trial court in the present case.

On appeal, Austin argued the prosecutor's theory that he was the actual killer because he handed the duct to the other defendant was legally erroneous. (*Garcia, supra*, 46 Cal.App.5th at p. 150.) The error was significant because under section 190.2(b), an "actual killer" need not have formed an intent to kill in order to be subject to a special circumstance finding under section 190.2, subdivision (a).[5] The Court of Appeal reviewed authority supporting the distinction between causing harm and personally inflicting harm, and authority distinguishing the concept of actual killer under section 190.2(b) from an aider and abettor under section 190.2, subdivision (d). (*Garcia*, at pp. 151-152.) From these authorities, the court concluded the meaning of "actual

---

[5] In the present case, the theory of prosecution and the jury instructions given confirm the robbery-murder special-circumstance allegation was premised on defendant being the actual killer under section 190.2(b).

20

killer" under section 190.2(b) is literal: "The actual killer is the person who personally kills the victim, whether by shooting, stabbing, or—in this case—taping his mouth closed, resulting in death by asphyxiation." (*Garcia*, at p. 152.)

As the meaning of actual killer is particular and restricted, the *Garcia* court concluded the jury should have been instructed that it could find to be true the special circumstance allegation under section 190.2(a)(17) and (b) "only if the prosecution proved beyond a reasonable doubt that Austin 'personally killed' [the victim]." (*Garcia, supra*, 46 Cal.App.5th at p. 155.) The prosecutor's argument was consistent with CALCRIM No. 730, but CALCRIM No. 730 was inconsistent with section 190.2(a)(17) and (b). (*Garcia*, at p. 155.) "The instruction as worded allowed the jury to find the special circumstance true if it determined that Austin 'caused' [the victim]'s death even if it did not find beyond a reasonable doubt that Austin participated in the taping of [the victim]'s face. Indeed, the prosecutor made this very argument when he said of instruction No. 730 that the jury could 'find the special circumstance true, that [Austin] did an act that caused the death of another person.'" (*Ibid.*)

The *Garcia* court interpreted the term actual killer in section 190.2(b) as applied to section 190.2(a)(17); however, we find no reason to believe the Legislature intended for the term actual killer to have a different meaning in section 189(e)(1), particularly given the Legislative history of Senate Bill No. 1437. (Cf. *People v. Gray* (2014) 58 Cal.4th 901, 906 ["when the same word appears in different places within a statutory scheme, courts generally presume the Legislature intended the word to have the same meaning each time it is used"].) Both section 189(e)(1) and section 190.2(a)(17) define and limit liability for felony murder: It therefore makes sense to interpret the term actual killer to have the same meaning in both section 189(e)(1) and section 190.2(b).

21

The record of conviction here does not permit us to say as a matter of law the jury found defendant personally killed the victim. Defendant testified that Argueta, while high and "freaking out," asked defendant to help him move out of his boyfriend's apartment. Defendant testified he accompanied Argueta to the victim's apartment and sat on a couch in the living room while Argueta went into other rooms. Defendant could hear Argueta moving around and screaming. Defendant used the bathroom, drank some water from a glass, and placed the glass on the kitchen counter. He never went into the bedroom. The prior opinion suggests, but does not confirm, there were no eyewitnesses to the murder except, perhaps, for defendant. The prior opinion does not disclose whether there was any direct evidence of who bludgeoned the victim. The only testimony about what happened inside the apartment came from defendant. Except for defendant's DNA on the drinking glass, the prior opinion does not disclose whether any forensic evidence was found in the apartment or on the murder weapon. (*People v. Lopez, supra*, G046477.)

The jury was instructed, consistently with the law, that "you may believe all, part, or none of any witness's testimony." (CALCRIM No. 226; see *Mosesian v. Bagdasarian* (1968) 260 Cal.App.2d 361, 368; see also *Astone v. Oldfield* (1945) 67 Cal.App.2d 702, 709.) It was possible, as defendant claims, that the jury, taking this instruction to heart, believed his testimony that he went to the victim's apartment with Argueta but disbelieved his testimony that he did not go into the bedroom and was not involved in the robbery or killing the victim. The jury might have rejected the prosecution's theory and arguments that defendant acted alone.

The jury instructions created the possibility the jury convicted defendant of felony murder and found to be true the robbery-murder special-circumstance allegation without finding him to have been the actual killer. The jury was not instructed it had to find defendant personally killed the victim to convict him; the jury was instructed it only had to find defendant committed an act that caused the victim's death. The jury might

22

have found defendant, though not the actual killer, participated somehow in the home invasion robbery, and the victim's death was the direct, natural, and probable consequence of an act committed in the course of his participation.  As defendant posits, "the jury could have taken a realistic view of the prosecution's circumstantial evidence and determined beyond a reasonable doubt that [defendant] was involved in the robbery that resulted in the death, but that [defendant] may or may not have been the actual killer."

The record of conviction therefore does not establish defendant is ineligible for relief under section 1170.95 as a matter of law.  In order to conclude defendant is ineligible for relief as a matter of law, we would have to weigh the evidence and find defendant to have been the actual killer, which would be impermissible at this stage. (*Lewis, supra*, 11 Cal.5th at p. 972.)

For those reasons, we conclude the trial court erred by denying defendant's petition for resentencing without issuing an order to show cause.  Our opinion should not be read as indicating whether or not the trial court should grant defendant resentencing relief.  We make no comment on that issue: Exercising de novo review, we conclude only that defendant has met his low burden of making a prima facie case for relief under section 1170.95.  Nor should our opinion be read as foreclosing the possibility the trial court may conclude, after an evidentiary hearing, the jury convicted defendant of malice aforethought murder rather than felony murder.

23

DISPOSITION

The postjudgment order denying defendant's petition for resentencing under Penal Code section 1170.95 is reversed.  The matter is remanded with directions to the trial court to issue an order to show cause and conduct an evidentiary hearing.


SANCHEZ, J.

WE CONCUR:


O'LEARY, P. J.


ZELON, J.*

*Retired Justice of the Court of Appeal, Second Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.